PER CURIAM.
Andrew Michael Gosciminski was indicted, tried, and convicted of robbery with a deadly weapon, burglary of a dwelling with an assault or battery, and first-degree murder of Joan Loughman. Gosciminski appeals his judgments of conviction and his sentence of death for the murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we reverse and remand for a new trial.

FACTS AND PROCEDURAL HISTORY

This case involves the burglary, robbery, and murder of Joan Loughman on September 24, 2002, at the home of her father on Hutchinson Island. The evidence presented during Gosciminski’s trial revealed the following facts.
On September 13, 2002, Joan Loughman flew down to Fort Pierce from Connecticut to arrange for her father, Frank Vala, to be moved into an assisted living facility. As was her custom, Joan wore all of her jewelry daily, which included a two-carat diamond ring and several other rings, bracelets, including one diamond tennis bracelet, and earrings with diamonds and emeralds. Joan’s sister described the two-carat diamond ring as a two-carat diamond set in platinum with two baguettes on the sides. Joan met with Gosciminski, who was the director of marketing at Lyford Cove, and subsequently, Joan chose Ly-ford Cove to take care of her father. On September 18, 2002, Joan’s father was admitted by Gosciminski to Lyford Cove. The day before he was admitted, Gosci-minski went to the Vala residence, where Joan was staying during her temporary visit to Fort Pierce, to help Joan move some of Mr. Vala’s belongings and furniture to Lyford Cove. After being at the facility for just one night, Mr. Vala had to be transferred to the hospital. Mr. Vala did not return to Lyford Cove after that, and instead he was transferred to hospice on September 24, 2002. On the evening of September 23, 2002, Joan contacted Gosci-minski and arranged to meet Gosciminski at Lyford Cove to. pick up some of her father’s belongings. Joan asked Goscimin-ski if he could carry her father’s suitcase to her car and Gosciminski did so.
On the morning of September 24, 2002, Joan spoke with her twin sister, Janet Vala-Terry, using the telephone at Mr. Vala’s house. The telephone conversation lasted five minutes. Joan said she had to hang up because someone was at the front door, but she did not say who was there. Joan was subsequently found dead in the bedroom of the Vala residence on the evening of September 24 by her sister, Janet, her brother, and her brother’s wife.[1] On *1021 the morning of September 24, Gosciminski was supposed to attend a staff meeting at Lyford Cove at 8:00 a.m. However, according to Gosciminski’s cell phone records, he called Lois Bosworth, one of the directors of the facility, at 8:15 a.m., to inform her that he would not be able to attend the staff meeting because he was going to Life Care Center in Fort Pierce to make a presentation that morning.[2] Gosciminski reached Lyford Cove shortly after lunch on that day. According to the testimonies of Debra Flynn, the executive director of the facility, and Nicole Rizzolo, the administrative assistant to Debra Flynn, Gosci-minski showed them a two-carat diamond ring that he took out from a tissue upon arriving at Lyford Cove. Gosciminski’s girlfriend at the time, Debra Thomas, testified that on the evening of September 24, Gosciminski gave her an engagement ring. She described the ring as a large diamond ring in a white gold or platinum band with baguettes on each side of the diamond.
During the investigation, on October 1, 2002, Detective Hickox went to Lyford Cove to talk to Debra Flynn and Goscimin-ski because the detective had learned that Gosciminski had been with Joan the evening before the murder. On October 2, Detective Hickox called Gosciminski to the police station for a recorded interview, which Gosciminski participated in voluntarily. At the same time, two other officers were sent to the new home of Debra Thomas and Gosciminski to question Debra Thomas about Joan’s murder. They asked her about the engagement ring Gos-ciminski gave her and she stated that it was the engagement ring Gosciminski had previously given her the first time they were engaged. Ms. Thomas testified that she did not tell the truth because she was afraid. Ms. Thomas testified that after the officers left, she got a phone call from Gosciminski who told her they had to get rid of the ring because it was hot. She also testified that after Gosciminski returned home, he took the ring, and the ring has not been seen since that day.
Gosciminski was subsequently arrested on October 3, 2002. He was indicted for the crimes on October 22, 2002. Goscimin-ski’s jury trial began on April 11, 2005. At trial, the State called numerous witnesses, including several investigators and detectives who examined the crime scene and who were involved in the investigation, and family members of Joan who knew about the jewelry she wore and who had talked to her while she was in Florida. The State also called witnesses who had seen the ring that Gosciminski gave Ms. Thomas the evening of September 24, 2002, and who subsequently were asked to pick out the ring they saw in a lineup.[3] The detectives who were involved with the investigation testified that they took fingerprints from the Vala residence as well as both of Gosciminski’s residences[4] and his truck, but did not find any matching fingerprints or any other scientific or forensic evidence to link Gosciminski to the crime. The weapon used in the murder was also not found.
The State also called Dr. Charles Diggs, the medical examiner involved in the case. As to the time of death, Dr. Diggs testified that in reality, it is not possible to deter *1022 mine the exact time of death. He testified that there is no exact science to determine the time of death, and that when the time of death is sometimes determined, it is merely speculation. However, he did state that it was not impossible that Joan’s murder could have occurred on the morning of September 24. Dr. Diggs said Joan died as a result of her throat being cut by a knife or knife-like object. Based on his observations at the crime scene and his findings from the autopsy, Dr. Diggs opined that Joan suffered three different types of injuries: bludgeoning, stabbing, and cutting. Although he could not say with certainty, his opinion as to the most likely sequence of events was that Joan was first stabbed, then bludgeoned, and then had her throat cut. He was much more firm on his opinion that Joan was first attacked in the hallway, which caused her to fall on her back, and then dragged into a bedroom, where she was severely bludgeoned with an ashtray stand, turned over, and cut in the throat.
On April 28, 2005, the jury returned its verdict finding Gosciminski guilty on three counts: first-degree murder, robbery with a deadly weapon, and burglary of a dwelling with an assault or battery. Following the penalty phase, the jury recommended death by a vote of nine to three. On June 7, 2005, the trial court followed the jury’s recommendation and sentenced Goscimin-ski to death. The trial court found three statutory aggravating circumstances: (1) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder for which Gosciminski was to be sentenced was committed while he was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery or burglary.[5] The court also found one statutory mitigator and numerous nonstatutory mitigators. The statutory mitigator found was that Gosciminski had no significant history of prior criminal activity and the court gave this mitigator some weight. The nonstatu-tory mitigators included: (1) Gosciminski served in the United States Air Force and was honorably discharged (moderate weight); (2) Gosciminski has demonstrated a positive correctional adjustment (moderate weight); (3) Gosciminski’s history does not indicate future dangerousness (moderate weight); (4) Gosciminski acted as a Good Samaritan by pulling a driver from a truck following an accident near Tampa (moderate weight); (5) Gosciminski had a relatively normal upbringing and did not engage in disruptive, disturbed or delinquent behavior as a child or young adult (some weight); (6) Gosciminski has a good work history working in the medical field and has been self-employed (some weight); (7) Gosciminski had no criminal history until he was forty-four years old (some weight); (8) Gosciminski presents a mixture of disordered personality characteristics (histrionic, somatic, narcissistic, self-defeating, antisocial, and aggressive) (some weight); (9) the effect of Gosciminski’s execution on his elderly mother (some weight); (10) the cumulative effect of all mitigation (some weight); (11) a life sentence means Gosciminski will never get out of prison (little weight); (12) Gosciminski had orthopedic injuries to his knees from a motorcycle accident (little weight); (13) Gosciminski had significant difficulty coping with the loss of his father from a massive heart attack in 1982 (little weight); and (14) Gosciminski has demonstrated good behavior during his trial (little weight). However, the trial court deter *1023 mined that these mitigating factors did not outweigh the aggravating circumstances, and the trial court sentenced Gosciminski to death on the count of first-degree murder and to life in prison for burglary and robbery.
Of the nineteen claims raised by Gosci-minski on appeal,[6] we only address claims nine, eleven, and twelve, which we find dispositive. Because we find that the trial court erred in its rulings on these claims, we vacate the judgments and sentences imposed and remand for a new trial.

ANALYSIS

Admissibility of Prosecutor’s Statement During Cross-Examination of Defendant

Gosciminski contends that the trial court erred in overruling the defense objection to the State’s question to Goscimin-ski suggesting that the ring he gave Debra Thomas was black and dirty from the blood of Joan Loughman. He asserts that there was no scientific evidence that there was blood on the ring and there was no good faith basis for such a question. The cross-examination of Gosciminski regarding this question occurred as follows:
Mr. Taylor: Didn’t you hear [Debra Flynn] testify that she was pointing to Number 3 and she said, you know, that could have been the ring that he was showing me except for the black around it?
Gosciminski: I do remember that.
Mr. Taylor: The black, the blood that you didn’t even bother wiping off that ring before you wanted to show off to these people?
*1024 After examining some autopsy photographs that had been admitted into evidence, the trial court overruled defense’s objection and accepted the State’s position that there were photographs of the victim that yielded an inference that there was blood on the jewelry. The trial court found that because there was a considerable amount of blood around the victim’s body and the victim’s hands were lying in bloody areas, it could be inferred that at the time of the murder, the jewelry that was removed from the victim had blood on it. The court also stated that there were witnesses who testified that the ring that Goscimin-ski gave Ms. Thomas appeared to be black.
We review a trial court’s ruling on the relevance of evidence under an abuse of discretion standard. See Dennis v. State, 817 So.2d 741 (Fla.), cert. denied, 537 U.S. 1051, 123 S.Ct. 604, 154 L.Ed.2d 527 (2002). We find that the trial court abused its discretion in overruling the defense’s objection to the State’s suggestion that there was blood on the ring. There was no evidence introduced that demonstrated that the dark color on the ring that Gosciminski gave Ms. Thomas was blood from the victim. The only evidence the State presented was that Joan was wearing her jewelry at the time of the attack, that the attack was bloody, and that the jewelry was taken afterwards. However, this is not enough evidence to suggest on cross-examination of Gosciminski that the ring Gosciminski presented to Ms. Thomas and his coworkers had blood on it simply because it looked old and had a dark substance on it. Although the trial court examined some autopsy photographs that were admitted and that showed a considerable amount of blood around the victim, it cannot be inferred from these photographs that the ring that Gosciminski showed his coworkers had blood on it.
Furthermore, the witnesses who testified that they saw the ring Gosciminski got for Ms. Thomas did not testify that the dark color that was on the ring was blood. Debra Flynn testified that when Goscimin-ski showed her the ring he got for Ms. Thomas, she noticed that the ring was old and dirty and it looked like more black was on it and around it. A few questions later, Flynn reiterated that the ring just looked old and that it was not striking because of the black around it. Ms. Thomas testified that the ring was rather dull and it looked like it needed to be cleaned. However, the State never elicited testimony to show that the darkness on the ring was in fact blood from the victim, or blood at all. The State was attempting to improperly suggest to the jury in the form of a question that the dark color on the ring that Gosciminski showed people and gave to Ms. Thomas was blood. The State did not have a good faith basis for asking this question or making such a suggestion to the jury.
Gosciminski also contends that it was improper for the State to infer that the dark substance on the ring could have been blood in its closing argument. The first alleged improper statement was, “He’s going there to meet Lois Bosworth and he takes a ring out of his pocket in the tissue. This ring that is dirty and that’s got black around it, black like the dried blood of the victim, dirty because he took it off her dead fingers.” The other alleged improper statement occurred when the State was explaining how certain witnesses picked out the replica of the ring stolen from the victim as the ring Gosciminski showed them. The State stated, “It just so happens Debra Flynn went to pick Number 3 but it’s dirtier and black. Is that from the blood?”
The State argues that the claim regarding the closing argument is not preserved because no contemporaneous objection was made to either of these statements during the State’s closing argument. *1025 We have generally held that “allegedly improper prosecutorial remarks cannot be appealed unless a contemporaneous objection is recorded.” Kilgore v. State, 688 So.2d 895, 898 (Fla.1996) (citing Gibson v. State, 351 So.2d 948, 950 (Fla.1977), cert. denied 435 U.S. 1004, 98 S.Ct. 1660, 56 L.Ed.2d 93 (1978)). However, under the circumstances, although defense counsel did not object to either of these statements during the State’s closing argument, we find that the claim is still preserved because these statements were a result of the trial court overruling the defense’s objection to the State’s suggestion during the cross-examination of Gosciminski that there was blood on the ring.
With regard to closing arguments, this Court has held that logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments from the evidence. Lukehart v. State, 776 So.2d 906 (Fla.2000), cert. denied, 533 U.S. 934, 121 S.Ct. 2561, 150 L.Ed.2d 726 (2001). However, the trial court erroneously allowed the State to suggest during its cross-examination of Gosciminski that the ring he gave Ms. Thomas was black and dirty from the blood of Joan Loughman; thus, this evidence was improperly admitted. The evidence suggesting that the black on the ring was blood was improperly admitted, and the State’s comments during closing argument exacerbated the error. Moreover, because the evidence was admitted by the trial court, an objection to the closing argument would have been futile.
We conclude that the trial court abused its discretion in overruling the defense objection to the State’s suggestion that the dark substance on the ring Gosciminski presented to his coworkers was blood from the victim. This error resulted in improper closing arguments by the State.

Hearsay Statements of Joan Loughman

Gosciminski also argues that the trial court erred in admitting Joan Loughman’s hearsay statements about Gosciminski noticing her jewelry through the testimonies of Joan’s sister and husband, and through the videotaped interview between Detective Hickox and Gosciminski. The State asserts the evidence was properly admitted because the testimonies were not offered for the truth of the matter asserted, but for impeachment purposes.
The State first attempted to introduce Joan’s statements through the videotaped interview between Detective Hickox and Gosciminski, where Detective Hickox was telling Gosciminski things that Joan told her sister, Janet, who then told the detectives. After defense counsel objected based on triple hearsay and moved for a mistrial, the State argued that they were offering the statements for impeachment purposes. The trial court first agreed that the statements constituted triple hearsay, but after the State argued that they would get Joan’s statements in through Janet’s testimony, the trial court denied the motion for mistrial. However, the trial court informed the defense that they could renew the motion if the State was not able to get the statement in through another witness.
Subsequently, the State called both Joan’s sister, Janet, and Joan’s husband, Thomas, to testify regarding Joan’s statements to them that Gosciminski had noticed her jewelry. In the middle of the State’s direct examination of Thomas, defense counsel again objected based on hearsay. Defense counsel argued that Joan’s statements to her husband and sister were hearsay because they were going to be used to prove the truth of the matter asserted. The State again argued that they were not trying to prove the truth of the matter asserted that Gosciminski was *1026 interested in Joan’s jewelry, but to impeach statements Gosciminski made to law enforcement during the videotaped interview that he never discussed jewelry with Joan. The trial court first explained that Joan’s statements seemed to be hearsay within hearsay, with the first portion being the statement by Gosciminski to Joan and the second portion being the statement by Joan to her husband and sister. The trial court then stated that although the statement by Gosciminski to Joan would be admissible as a statement by a party opponent, the statement by Joan to her husband and sister did not fall under any hearsay exception.[7] However, the trial court ultimately agreed with the State and found that the State was using Joan’s statements to impeach statements that Gosciminski made to law enforcement, and as a result, the statements were admissible as prior inconsistent statements for impeachment purposes.
We find that the trial court abused its discretion in finding that Joan’s hearsay statements through the testimonies of her sister and husband, and through the videotaped interview between Detective Hickox and Gosciminski, were admissible for impeachment purposes. These statements were actually being offered to prove the truth of the matter asserted — that Gosci-minski noticed and had an interest in Joan’s jewelry. The State introduced Joan’s statements regarding Gosciminski’s interest in her jewelry through the videotaped interview between Detective Hickox and Gosciminski, and also through Joan’s husband and sister. It was important for the State to demonstrate to the jury that Gosciminski had taken notice of Joan’s jewelry to demonstrate that Gosciminski committed the crime because during the attack jewelry had been removed from her body. Thus, although the State argued that they were using Joan’s statements to impeach Gosciminski’s statement to law enforcement, we find that this was not simply an attack on Gosciminski’s credibility. Rather, the State made an active and continuing effort to persuade the jury to believe Joan’s statements, both through the testimonies of both Joan’s husband and sister and through the videotaped interview between Detective Hickox and Gosci-minski, that Gosciminski did notice her jewelry, and to reject Gosciminski’s statement to law enforcement that he did not notice Joan’s jewelry. As a result, Joan’s statements constitute hearsay.
Moreover, Joan’s statements constitute hearsay within hearsay because Joan made her statements about Gosciminski noticing her jewelry to her sister and husband, who then told the detectives, and then Detective Hickox used those statements to question Gosciminski during the videotaped interview. As a result, each hearsay statement must fall under an exception for Joan’s statements to be admissible. See § 90.805, Fla. Stat. (2007). In reviewing the listed exceptions under the hearsay rule, none of the statements fit into any of the recognized hearsay exceptions; thus, we find that Joan’s statements are not admissible. See §§ 90.803(l)-(24), 90.804(2), Fla. Stat. (2007); see also Stoll v. State, 762 So.2d 870 (Fla.2000) (finding that a portion of a witness’s testimony was inadmissible because it constituted hear *1027 say within hearsay, and none of the hearsay exceptions applied to any of the hearsay statements). Accordingly, the trial court erred in admitting this evidence over the defense’s objection.

Harmless Error Analysis

In State v. DiGuilio, 491 So.2d 1129 (Fla.1986), this Court set forth the harmless error test, which
places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.
Id. at 1135 (citations omitted). We are not persuaded that the combined errors in the instant case were harmless beyond a reasonable doubt.
The trial court erred in admitting evidence that suggested that the darkness on the ring Gosciminski showed his coworkers and gave to his girlfriend was blood from the victim. The State improperly made this suggestion through its cross-examination of Gosciminski and during closing arguments without presenting any evidence to show that the dark substance on the ring was in fact blood from the victim, or even blood at all. This impermissible suggestion was prejudicial to the defense because the description of the ring stolen from Joan during the crime and the description of the ring that Gosci-minski showed his coworkers and presented to Debra Thomas were similar. The trial court also erred in admitting the victim’s hearsay statements that Gosciminski had noticed the jewelry she was wearing. Although the State argued and the trial court held that such statements were permissible as impeachment, it is clear from the record that the State improperly used these statements substantively to prove the truth of the matter asserted, that Gos-ciminski did in fact have an interest in the victim’s jewelry. The admission of these hearsay statements was also prejudicial because by emphasizing that Gosciminski took interest in Joan’s jewelry and was looking to buy a ring for his girlfriend, the State was persuading the jury that Gosci-minski committed this crime to get the jewelry from Joan.
While the State presented circumstantial evidence regarding Gosciminski’s involvement in the crime, the State did not present any direct evidence to tie Gosciminski to the crime. The circumstantial evidence presented that linked Gosciminski to the crime was that he knew the victim and knew the location of the Vala residence, which is where the crime occurred; based on his cell phone records, he was somewhere in the vicinity of the Vala residence the morning the crime was committed; Gosciminski was not at work during the time the murder was committed, and according to coworkers’ testimonies, when he came to work, he appeared to be “freshly scrubbed” like he had just showered; and Debra Thomas testified that she saw Gos-ciminski at home that afternoon with bloody clothes and blood on his arm.
However, despite all the blood, fingerprints, and other evidence found at the crime scene, not one piece of physical evidence or eyewitness testimony tied Gosci-minski to this murder. The detectives who were involved with the investigation testified that they took fingerprints from the scene of the crime as well as both of Gosciminski’s residences and his truck, but did not find any matching fingerprints or *1028 any other scientific evidence to link Gosci-minski to the crime. The bloody clothes that Debra Thomas testified to seeing were never found. The weapon used in the murder was not found. Moreover, Dr. Charles Diggs, the medical examiner involved in the case, was not able to determine the exact time of death.
In light of the limited evidence connecting Gosciminski to this murder and the significance of the prejudice caused by the improperly admitted evidence, we cannot conclude beyond a reasonable doubt that these errors did not contribute to the guilty verdict. Accordingly, Gosciminski was denied a fair trial.

CONCLUSION

For the reasons stated above, we reverse Gosciminski’s convictions and sentences and remand for a new trial.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
QUINCE, C.J., dissents with an opinion.
CANADY and POLSTON, JJ., did not participate.

. Joan’s sister, brother, and brother’s wife had flown down to Florida that evening to meet Joan at the hospice where Mr. Vala had been transferred. Joan had plans to fly back to Connecticut on September 25.

. Gosciminski’s testimony was the only evidence offered concerning the presentation at Life Care Center that morning.

. A replica of Joan's ring had been made by a jeweler based on the family’s description of what the ring looked like and photographs provided by Joan's family. This ring was put in a line-up with five other rings, and witnesses who had seen the ring Gosciminski gave Ms. Thomas were called in to identify which ring they saw.

.Gosciminski and Ms. Thomas moved to a new house a few days after the day of Joan's murder.

. The court found that the pecuniary gain aggravator applied but recognized that this aggravator merged with the aggravator of murder committed in the course of a felony.

. The nineteen claims raised are: (1) whether the evidence was insufficient for conviction; (2) whether the court erred in allowing testimony as to the time it took officers to drive to and from the scene of the murder long after the date of the murder; (3) whether the court erred and abused its discretion in allowing testimony and exhibits regarding the area of 100% maximum coverage of cell phone towers; (4) whether the court erred in overruling the discovery objection and denying a mistrial, and letting the State introduce the Capital One credit card statement; (5) whether the court erred and abused its discretion in denying the defense cause challenge to juror Schmidt; (6) whether the court erred in not letting the defense present evidence that two-carat rings with baguettes on each side are widely available on sale in jewelry stores; (7) whether the court erred in allowing the State to imply on cross-examination that Goscimin-ski fashioned his testimony after seeing all the evidence and hearing all the witnesses; (8) whether the court erred in denying a mistrial and taking no corrective action when the State commented on Gosciminski’s not having previously said that Debra Thomas was with him when he met Joan Loughman; (9) whether the court erred in overruling the defense's objection to the State’s question to Gosciminski suggesting that the ring was black and dirty from the blood of Joan Lough-man; (10) whether the court erred in denying the motion for mistrial when the State suggested that Gosciminski had stolen from his mother while she was in a nursing home; (11) whether the court erred in allowing hearsay statements of Joan Loughman in the videotape; (12) whether the court erred in allowing Joan Loughman's hearsay statements to her husband and sister; (13) whether the court erred in excluding Detective Hickox’s statement to Ben Thomas of his opinion that he would not bet his house on an indictment without more evidence; (14) whether the court erred in sustaining objections to defense argument on circumstantial evidence and altering the agreed-to instruction in the middle of the defense’s final argument; (15) whether the court should have granted disclosure or review of grand jury testimony; (16) whether the court erred in allowing hearsay that another person was eliminated as a suspect in the case; (17) whether the court erred in finding the cold, calculated, and premeditated (CCP) aggravator; (18) whether the court erred in finding the heinous, atrocious, or cruel (HAC) aggravator; and (19) whether the court erred by not finding in writing sufficient aggravating circumstances to support a death sentence.

. Although we ultimately find that Joan’s statements were inadmissible hearsay within hearsay, we must also note that the trial court erred in finding that the first portion of the hearsay within hearsay statements was Gosci-minski’s statement to Joan. The issue concerns Joan’s statements to her husband and sister that Gosciminski had noticed her jewelry. The sister and husband then relayed these statements made by Joan to the detectives, who then used the statements to question Gosciminski. Thus, the first portion of the hearsay within hearsay was Joan's statements to her sister and husband, not Gosciminski’s statement to Joan.