[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 23, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-12442

_____

D. C. Docket No. 06-21619-CV-PCH

AMNESTY INTERNATIONAL, USA,

Plaintiff-Appellant,

versus

LOUIS BATTLE,
THOMAS CANNON,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 23, 2009)

Before HULL, MARCUS, and KRAVITCH, Circuit Judges.

KRAVITCH, Senior Circuit Judge:

Amnesty International ("Amnesty") appeals the dismissal of its complaint against police officers Louis Battle and Thomas Cannon brought pursuant to 42 U.S.C. § 1983 and alleging violations of its First Amendment rights during a protest rally. The district court found that Battle and Cannon were entitled to qualified immunity. We hold that Amnesty's complaint properly states a valid claim alleging a violation of its First Amendment rights including its right to be heard and to distribute pamphlets without unreasonable police interference and therefore reverse the district court's dismissal of Amnesty's complaint.

## I. BACKGROUND

The complaint alleges the following facts:

On November 20, 2003, Amnesty planned to hold a demonstration and rally near, and in protest against, a meeting of the Free Trade Association of the Americas in Miami.[1] Amnesty obtained a permit from the City of Miami Police Department to conduct this demonstration on that date at the Torch of Friendship, a monument with a surrounding plaza within Bayfront Park in Miami.

Anticipating that a large number of people would assemble in downtown Miami to protest the Free Trade Association meeting, the City of Miami Police

---

[1] Amnesty held a similar rally in 1994 at the same location. One hundred people attended and no violence or disturbance occurred.

2

Department formulated a security plan to handle the demonstrations and enlisted the help of police entities from other jurisdictions, including the Miami-Dade County Police Department. Defendants Battle and Cannon were officers supervising subordinate police officers in the downtown area of Miami on November 20, 2003. Battle worked for the Miami-Dade Police Department and Cannon worked for the City of Miami Police Department.

Just after 10:00 am, Amnesty had gathered ten to twelve people in the Torch of Friendship area, most of whom were speakers and Amnesty members, and attempted to begin its demonstration. At around the same time, Defendants directed their subordinate officers to create a police cordon 50 to 75 yards from the Torch of Friendship and to allow no one to enter the area. "People in the area," as stated in the complaint, attempted to attend the demonstration but the cordon prevented them from doing so. They also could not hear or see the people speaking at Amnesty's demonstration because the police cordon kept them at too great a distance. Amnesty members attempted to pass through the cordon to hand out Amnesty literature to the crowd beyond the cordon, invite people to attend their demonstration, and obtain media coverage for their rally, but the police cordon kept the Amnesty members inside the Torch of Friendship and prevented them from doing any of these above activities.

3

Specifically, the complaint alleges:

> [t]he Defendants knew of Amnesty's First and Fourteenth Amendment rights, knew that these rights were clearly established, knew of Amnesty's permit, and knew that their actions would destroy these rights . . . As the direct and proximate result of the illegal and unconstitutional acts of the Defendants . . . Amnesty's First and Fourteenth Amendment rights were destroyed, it was unable to have its message heard, people were unable to attend its rally/ demonstration, people were unable to hear its speakers, it was unable to invite people to attend the rally/demonstration, it was unable to distribute literature to the people, it was unable to obtain media coverage of its rally/demonstration, it was unable to distribute literature to representatives of the media and it was unable to speak to representatives of the media.

Amnesty requested compensatory and punitive damages, a declaratory judgment that Defendant's actions violated Amnesty's First and Fourteenth[2] Amendment rights, and attorney's fees and costs.

Defendants filed a motion to dismiss, asserting qualified immunity and arguing that Amnesty lacked standing. The district court granted the motion, finding that the allegations were not detailed enough to satisfy the heightened pleading standard for § 1983 actions, especially in light of the failure to identify a specific individual who was prevented from joining the rally or a specific media reporter that was unable to cover the protest.

---

[2] Amnesty makes no mention of rights specific to the Fourteenth Amendment such as due process or equal protection. We, therefore, assume that the inclusion of the Fourteenth Amendment refers *only* to the application of the First Amendment to the states.

The district court also found that, even assuming that the allegations were sufficiently pleaded, Amnesty had "failed to establish that its purported rights were clearly established" and thus failed to overcome Defendants' qualified immunity from suit. The court distinguished the two main cases cited by Amnesty to support its asserted right to protest peacefully, Edwards v. South Carolina, 372 U.S. 229 (1963) and Jones v. Parmley, 465 F.3d 46 (2d Cir. 2006), by noting that both cases involved the arrest of protestors. Because no member of Amnesty was arrested, the court concluded that those cases could not clearly establish a violation of Amnesty's First Amendment rights. The court stated "Amnesty has failed to show that any reasonable official in Defendants' position would have known that ordering the formation of a cordon of police officers near the sight of a permitted demonstration was a violation of the demonstrating organization's First Amendment rights." Having found that Amnesty failed to overcome Defendants' qualified immunity, the district court dismissed the complaint for failure to state a claim. The district court did not address standing. Amnesty timely appealed.

## II. STANDARD OF REVIEW

We analyze standing de novo. Florida Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel, 194 F.3d 1227, 1229 (11th Cir. 1999).

We also review de novo an order granting a motion to dismiss, Doe v.

5

Pryor, 344 F.3d 1282, 1284 (11th Cir. 2003), and "accept all well-pleaded factual allegations as true and construe the facts in the light most favorable to the plaintiff." Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003).

## III.  DISCUSSION

*Standing*

The district court erred in addressing the merits of Amnesty's claim and Defendants' qualified immunity without first assuring itself that Amnesty had standing to bring this suit.  "A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises." Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1328 n.4 (11th Cir. 1999).  "Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005).  The standing inquiry "is an essential and unchanging part of the case-or-controversy requirement of Article III" of the United States Constitution. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  To have standing, a plaintiff must establish (1) an injury in fact, which is concrete and particularized and actual or imminent; (2) a causal connection between the injury and the causal conduct; and (3) a substantial likelihood that a favorable decision will redress the injury.

6

Granite State Outdoor Adver. Co. v. City of Clearwater, Fla., 351 F.3d 1112, 1116 (11th Cir. 2003) (citing Bennett v. Spear, 520 U.S. 154, 167 (1997)).

The party invoking federal jurisdiction — in this case, Amnesty — bears the burden of establishing standing. Lujan, 504 U.S. at 561. Each element of standing must be supported in the same manner as any other matter on which the plaintiff bears the burden of proof. Tanner Adver. Group LLC v. Fayette County, Ga., 451 F.3d 777, 791 (11th Cir. 2006). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Lujan, 504 U.S. at 561.

Other than the asserted violations of First Amendment rights, Amnesty has alleged no injury-in-fact to either itself or its members. Amnesty's complaint does not describe any injury flowing from the constitutional violations. Amnesty appears to argue on appeal that this court should infer an injury to Amnesty's ability to pressure countries to release political prisoners from Amnesty's inability to have a successful protest rally on November 20, 2003, but this injury is not set forth in the complaint. The complaint provides the mission statement of the organization and discusses the alleged violation of constitutional rights, but fails to describe a link explaining how the violations caused any injury. "It is not

7

enough that the plaintiff's complaint sets forth facts from which we could *imagine* an injury sufficient to satisfy Article III's standing requirements, since we should not speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none." Bochese, 405 F.3d at 976 (internal quotation and alteration omitted). Because Amnesty failed to allege an injury-in-fact, it lacks standing to bring a § 1983 claim for compensatory damages.

Section 1983, however, allows for the recovery of nominal damages where the plaintiff's constitutional rights were violated but the violation did not result in any injury giving rise to compensatory damages. Slicker v. Jackson, 215 F.3d 1225, 1227 (11th Cir. 2000); see also Al-Amin v. Smith, 511 F.3d 1317, 1335 (11th Cir. 2008) ("Our precedent . . . recognizes the award of nominal damages for violations of the fundamental constitutional right to free speech absent any actual injury."). By alleging that its First and Fourteenth Amendment rights were violated, Amnesty has established standing to bring a § 1983 claim for nominal damages even without alleging a specific injuring flowing from the violations. See Covenant Media of South Carolina, LLC v. City of North Charleston, 493 F.3d 421, 428 (4th Cir. 2007) (holding that the plaintiff had suffered an injury sufficient to establish standing where an unconstitutional application of law

8

created a claim "redressable at least by nominal damages").[3]

Although Amnesty alleged sufficient facts to support its claims for nominal damages, there remain a few questions as to its standing. Amnesty asserted claims on two grounds: on behalf of its members and in its own capacity as a organization. We, however, conclude that Amnesty established standing only on the claim brought on its own behalf.

Amnesty's complaint states that its own First Amendment rights were violated because "it was unable to have its message heard, . . . it was unable to distribute literature to the people, it was unable to obtain media coverage of its rally/demonstration . . . and it was unable to speak to representatives of the media." These statements allege violations of Amnesty's own constitutional rights, and establish Amnesty's standing to bring a § 1983 claim for itself. See generally Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County, 450 F.3d 1295, 1305-06 (11th Cir. 2006) (noting that corporations and organizations have standing to sue under § 1983 for violations of their own First Amendment rights).

Regarding Amnesty's representational standing, Amnesty's complaint states

---

[3] We note that punitive damages may be available to Amnesty should it prevail on the merits. Harden v. Pataki, 320 F.3d 1289, 1300 n.14 (11th Cir. 2003).

that Amnesty members were prevented from distributing literature, from signing up new members, from obtaining media coverage, and from passing through the police cordon to gather an audience. "It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." Sierra Club v. Morton, 405 U.S. 727, 739 (1972). The Supreme Court has put limits, however, on the right of organizations to represent its injured members in litigation. The Court "recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). For the same reasons that Amnesty has standing to bring this claim on its own behalf for the violation of its own First Amendment rights, we conclude that those Amnesty members present at the attempted demonstration on November 20, 2003 would have standing to bring claims for the alleged violations of their rights that day. The complaint provides that "Amnesty is involved in securing the release of political prisoners throughout the world through rallies, demonstrations, letter writing, and other means." The protection of Amnesty members' rights to protest

10

and distribute literature is clearly germane to this purpose. It is less clear whether this suit meets the third prong: whether it requires the participation of individual members in the lawsuit. Amnesty has not discussed this prong; it has provided no explanation or reasons why the members are not needed. Because Amnesty bears the burden of proof on standing, Lujan, 504 U.S. at 561, we must therefore hold that Amnesty has not established standing to sue on behalf of its members.[4]

*Pleading Requirements*

On appeal, Amnesty claims that the district court erred in applying a heightened pleading standard. Although we agree with Defendants that a heightened standard applies to § 1983 cases against individuals who are eligible to claim qualified immunity, we conclude that Amnesty satisfied this standard.

This court has established a heightened pleading standard applicable to § 1983 actions. See Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir. 1992). The Supreme Court, however, called this rule into question in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507

---

[4] The complaint also mentions other "people in the area" and "media representatives" who were unable to attend or hear the demonstration because of the police cordon, but does not affirmatively state that these were or are members of Amnesty. It is unclear whether Amnesty intended this suit to cover claims on behalf of these other individuals. Regardless, an organization may not bring suit on behalf of non-members. United States v. City of Miami, Fla., 115 F.3d 870, 872 (11th Cir. 1997). Thus, Amnesty has not established standing to bring suit on behalf of these individuals who were prevented from participating in the demonstration.

11

U.S. 163 (1993), by holding that courts may not employ a heightened pleading standard in civil rights cases alleging municipal liability. Since Leatherman, this court has determined that heightened pleading still applies where the defendants are individuals for whom qualified immunity may be available. See Swann v. S. Health Partners, Inc., 388 F.3d 834, 838 (11th Cir. 2004) (discussing this court's case law on pleading in qualified immunity cases). Thus, under the law of this Circuit, heightened pleading is required where, as here, the defendants are individuals who may seek qualified immunity. In addition to the Federal Rules of Civil Procedure 8(a)(2) requirement that the complaint contain a short, plain statement of the claim, "[i]n pleading a section 1983 action, some factual detail is necessary, especially if [the court is] to be able to see that the allegedly violated right was clearly established when the allegedly wrongful acts occurred." Oladeinde, 963 F.2d at 1485. A complaint alleging civil rights violations "will be dismissed as insufficient where the allegations it contains are vague and conclusory." Fullman v. Graddick, 739 F.2d 553, 556-57 (11th Cir. 1984).[5]

Defendants argue that Amnesty failed to satisfy the applicable heightened

---

[5] To the extent Amnesty argues that heightened pleading should not apply in § 1983 actions against individual defendants, we are bound by this court's precedent unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or this court sitting en banc. Smith v. GTE Corp., 236 F.3d 1292, 1300 n.8 (11th Cir. 2001).

pleading standard because it did not allege sufficient facts to establish a violation of the organization's constitutional rights and overcome Defendants' qualified immunity. Defendants also contend that Amnesty should have identified specific people who were unable to join or hear the demonstration and specific actions of each defendant, rather than lumping both together with only vague allegations.[6]

To state a claim under § 1983, a plaintiff must allege that he was deprived of a federal right by a person acting under color of state law.[7] 42 U.S.C. § 1983. Additionally, because the defense of qualified immunity should be resolved at the earliest possible procedural moment, the complaint must allege sufficient facts for the court to determine whether the alleged constitutional violation was clearly established at the time of the incident. See Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (noting that dismissal of a § 1983 claim is proper if the complaint fails to allege the violation of a clearly established constitutional right).

Here, the district court conflated the issues of satisfying the heightened pleading with the need to overcome qualified immunity. To satisfy even the heightened pleading standard for § 1983 claims, Amnesty need plead only "some

---

[6] Defendants also argue that Amnesty has improperly pleaded a conspiracy claim. As Amnesty concedes it is not pursuing a conspiracy claim, this court need not address this issue.

[7] The parties do not dispute that Defendants were acting under color of state law.

13

factual detail" from which the court may determine whether Defendants' alleged actions violated a clearly established constitutional right. Oladeinde, 963 F.2d at 1485. The heightened pleading standard does not require a complaint to cite cases demonstrating that the defendant is not entitled to qualified immunity.

Although the complaint is concededly sparse, Amnesty has satisfied the heightened pleading standard. The complaint states that the police cordon created at Defendants' direction "destroyed Amnesty's rally/ demonstration" by preventing Amnesty members from being heard or seen by potential audience members and media representatives and from distributing literature to people in the area. The complaint asserts that "[a]s the direct and proximate result of the illegal and unconstitutional acts of the Defendants, set forth above, Amnesty's First and Fourteenth Amendment rights were destroyed . . . ." Thus, the complaint makes clear Amnesty's allegation that its First and Fourteenth Amendment rights were violated because it was unable to have a successful protest rally and unable to pass out Amnesty literature as a result of Defendants' creation of a police cordon. These facts provide sufficient detail for Defendants to understand what alleged rights were violated (the right to hold a peaceful protest with an audience and the right to pass out leaflets) and which of their actions allegedly violated those rights (Defendants' actions ordering their subordinates to create a police

14

cordon which interfered with the rally and the distribution of leaflets).  These facts

also provide enough information for the court to determine whether those facts

indeed set out a violation of rights and whether those rights were clearly

established when these incidents occurred.

As to Defendants' second point, we disagree that Amnesty was required to

identify, by name, the individual members affected.  The district court relied on

GJR Investments, Inc. v. County of Escambia, Fla., 132 F.3d 1359 (11th Cir.

1998) in concluding that pleadings were deficient because the complaint failed to

name individual Amnesty members.  In GJR Investments, the plaintiff brought a

§ 1983 equal protection claim but neglected to identify the other similarly-situated

individuals who received better treatment.  Id. at 1367-68.  In order to state an

equal protection claim, the plaintiff must prove that he was discriminated against

by establishing that other similarly-situated individuals outside of his protected

class were treated more favorably.  Id.  Thus, the identification of these individuals

comprised a part of the claim itself.  Unlike an equal protection claim, a First

Amendment claim does not rely on the identification of an individual, and so GJR

Investments is inapposite.

Finally, we disagree with Defendants' contention that Amnesty improperly

pleaded a claim for supervisory liability against Defendants.  It is well-established

15

that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or respondeat superior. Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994). Supervisors are liable under § 1983 when "the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." Gonzalez, 325 F.3d at 1234. A causal connection can be established by, inter alia, "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Id. Amnesty's complaint alleges that "Defendants directed police officers whom they supervised to take police action that destroyed Amnesty's rally/demonstration. The Defendants ordered these police officers to form a cordon, 50 to 75 yards from the Torch of Friendship, and to allow no one to enter." Taken as true, the allegations in the complaint pleaded a causal connection between the Defendants' actions and the constitutional violations.

*Qualified Immunity*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

16

have known.'" Pearson v. Callahan,129 S.Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court developed a two-step analysis to determine if qualified immunity applies. Under Saucier, a court first determines whether the plaintiff was exercising a constitutional right and whether the defendant's action impermissibly burdened the exercise of that right. Id. If a constitutional violation occurred, the court then proceeds to determine whether that right was clearly established. Id. Although this two-step inquiry is no longer mandatory, we think it remains appropriate in this case. Pearson, 129 S.Ct. at 818 ("Although . . . the Saucier protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial.").

1. Does the Complaint Allege a Violation of Constitutional Rights?

The alleged violations of constitutional rights occurred when Amnesty was prevented from (1) distributing literature to people attending the various protests in the area, and (2) conducting a successful demonstration with an audience and media coverage.

The Supreme Court has recognized that passing out leaflets is an activity protected by the First Amendment. Hill v. Colorado, 530 U.S. 703, 715 (2000); Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971). This right,

17

however — like nearly every other constitutional right — is not without limitation. In Heffron v. Int'l Soc'y for Krishna Consciousness, the Supreme Court held that it was constitutionally permissible to restrict leafletting at a state fair to certain locations as part of a reasonable time, manner, and location restriction. 452 U.S. 640, 647 (1981). Defendants argue that in light of the high profile Free Trade Association meeting and the "hundreds of people in the area," a police presence was objectively reasonable. A police presence, however, is not the action which interfered with Amnesty's ability to distribute leaflets. According to the complaint, Defendants ordered a police cordon to form around and 50 to 75 yards away from Amnesty's demonstration preventing Amnesty from leaving the Torch of Friendship area and passing out literature. We see nothing indicating that this extreme action constituted a "reasonable time, manner, and location restriction." We will not assume from the mere presence of a large number of people in the area that a level of danger existed that justified the complete deprivation of Amnesty's right to pass out literature. See Bourgeois v. Peters, 387 F.3d 1303, 1311 (11th Cir. 2004)(noting that the constitution contains no exception to the personal rights of citizens "for large gatherings of people"). Thus, Amnesty's complaint alleges a violation of its right to pass out literature about its organization and its views.

18

Amnesty also has a constitutional right to engage in peaceful protest on public land, such as in a city park. Frisby v. Schultz, 487 U.S.474, 484 (1988) ("In . . . quintessential public fora, the government may not prohibit all communicative activity."); Shuttlesworth v. City of Birmingham, Ala., 394 U.S. 147, 162 (1969) (Harlan, J., concurring) (noting that the right to assemble peaceably to voice political protest is a basic right). Governments may not prevent protests, punish the exercise of the right to protest peacefully by arresting the demonstrators, nor unduly burden the right by forcing demonstrators to undergo excessive searches that violate the Fourth Amendment . Edwards v. South Carolina, 372 U.S. 229, 235 (1963); Cox v. State of Louisiana, 379 U.S. 536, 545 (1965); Bourgeois, 387 F.3d at 1324-25.

This is not the end of our analysis, however, for Amnesty was not prevented from holding its demonstration or arrested for attempting to hold a protest rally. Rather, Amnesty alleges that its demonstration was rendered ineffective by Defendants' actions because no one could attend, see, or hear the demonstration. "Our cases make clear [] that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest,

19

and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)). So the question before this court is, essentially, whether the police may restrict the right to conduct a peaceful protest rally so completely that they prevent the rally from being seen or heard.

In Saia v. People of State of N.Y., the Supreme Court struck down an ordinance which gave the police unbridled discretion to ban the use of loud speakers. 334 U.S. 558 (1948). The Court held that the First Amendment carried with it a "right to be heard" that should not be infringed upon by an ordinance in which "no standards [were] prescribed for the exercise of [police] discretion." Id. at 560. This court noted that a constitutional problem would arise were the government to deprive protestors of an audience by drowning-out those protestors with the government's own, louder communication. Warner Cable Commc'ns, Inc. v. City of Niceville, 911 F.2d 634, 638 (11th Cir. 1990) ("We agree that the government may not speak so loudly as to make it impossible for other speakers to be heard by their audience. The government would then be preventing the speakers' access to that audience, and first amendment concerns would arise."). In Ward v. Rock Against Racism, the Supreme Court reviewed a city's efforts to

regulate the volume of amplified music at concerts held at an amphitheater in a public park. 491 U.S. at 784. Although the Court upheld the city's limitations on volume, it did so only after noting that the limits left open "ample alternative channels of communication" and that concert organizers could still express themselves with their own decisions as to sound-mixing and sound volume within the limits imposed by the city. Id. at 800-02. These cases establish a "right to be heard" inherent in the First Amendment. This right is obvious from the grant of the freedom of speech itself; the right to demonstrate would be meaningless if governments were entitled to isolate a demonstration so completely that no one could see or hear it.

The Tenth Circuit faced a situation similar to this case wherein plaintiffs brought a § 1983 lawsuit contending that their First Amendment rights were violated when they were kept outside security zones near a NATO meeting in Colorado. Citizens for Peace in Space v. City of Colorado Springs, Colo., 477 F.3d 1212 (10th Cir. 2007). In that case, the city created a "secured zone" around the conference center where the meeting was held into which protestors could not go. Id. at 1217. Protestors were allowed to congregate near one, but only one, of the entry checkpoints through which meeting attendees traveled. Id. Accredited media representatives were allowed into the secured zone and were separated from

21

the protestors.  Id.  Plaintiffs brought a suit for nominal damages arguing that keeping them out of the security zone and therefore away from their intended audience and media representatives violated their constitutional rights to conduct a peaceful protest.  Id.  Although the court held that these restrictions were permissible in light of the significant government interest in preventing terrorist attacks at the NATO meeting, the court so concluded only after assuring itself that plaintiffs were not completely deprived of an audience for their message.  Id. at 1226.  The court noted that plaintiffs were seen by all conference delegates and media personnel entering the secured area, and that the plaintiffs were in fact interviewed by local media.  Id.  Thus, the court felt that the protestors' First Amendment rights were not violated because it was "not a case where the citizens were wholly deprived of their ability to communicate effectively . . . They were not wholly cut off from their intended audience, such that there were no ample alternatives to a protest within the security zone itself."  Id.

In this case, the restriction of Amnesty to a certain area away from its desired audience was similar to that in Citizens for Peace in Space, but the impact on the demonstration was far different.  Here, according to the complaint, Amnesty was completely prevented from communicating its message to anyone because no one was allowed into the Torch of Friendship area to attend the rally,

22

and no Amnesty speaker was allowed out to reach them through any other means, not even leafletting. Amnesty had a permit to hold a demonstration at the Torch of Friendship on November 20, 2003 and had previously held a similar protest in 1994 that occurred without any incidents of violence. And yet Defendants ordered the creation of a police cordon 50 to 75 yards away from Amnesty's demonstration, making it impossible for Amnesty's speakers to be seen or heard. This action is no different than if the City of Miami had given Amnesty a permit to hold a meeting in an auditorium and then barred the doors and windows such that no audience could enter and no sound could escape the building. Such action clearly fails to leave open "ample alternative channels for communication."

We recognize that police may properly limit the exercise of free speech where necessary for the safety and protection of protestors and the community. Cantwell v. Connecticut, 310 U.S. 296, 304 (1940) ("Conduct remains subject to regulation for the protection of society."). But even permissible regulation must not unduly infringe the protected freedom." Id. The alleged action in this case was not constitutionally permissible without a greater justification than has been given. The presence of a large group of people, without more, is not sufficient to justify the extreme action taken here. Defendants have argued only vaguely that the police restrictions were "essential" in light of potentially violent protests in the

area outside the Torch of Friendship and the large groups of people in the area. Defendants have not provided sufficient detail for us to analyze this asserted significant government interest and to judge whether the action taken was narrowly tailored to serve this interest. A "potential" for violence hardly justifies placing a cordon 50 to 75 yards – a significant distance – away from Amnesty's protest and preventing any and all communication from passing through the cordon. We are hard-pressed to see how a small cordon placed just 15 or 20 feet away from the speakers would not have been just as effective at preventing violence and protecting plaintiff's members without infringing on plaintiff's rights, if a cordon was indeed "essential."[8] Without greater justification than has been presented, Defendants' creation of a police cordon at so great a distance that Amnesty could not be seen or heard and members could not pass through to distribute literature was not narrowly tailored to serve a significant government interest and did not leave open ample alternative channels of communication. We hold, therefore, that Amnesty alleged a violation of its constitutional rights.

---

[8] We do not mean to suggest that, if there was danger present, Defendants were required to use the least restrictive means possible in limiting Amnesty's rally. See Ward, 491 U.S. at 798 (noting that restrictions on First-Amendment-protected speech need not be the "least restrictive" or intrusive means of meeting the government's interests). We simply note that the extreme nature of the police cordon in this case calls into question Defendants' assertion that their actions were absolutely necessary.

2. Were these rights "Clearly Established"?

Although Amnesty alleged violations of its constitutional rights, Defendants will still be entitled to qualified immunity unless those rights were "clearly established" at the time the violations took place. Andujar v. Rodriguez, 486 F.3d 1199, 1202-03 (11th Cir. 2007). Under this analysis, we evaluate whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). In this Circuit, only the caselaw of the Supreme Court, the Eleventh Circuit or the law of the highest court of the state where the events took place — in this case, Florida — can "clearly establish" constitutional rights. Marsh v. Butler County, Ala., 268 F.3d 1014, 1032 n.10 (11th Cir. 2001).

Supreme Court caselaw makes clear that the First Amendment right to distribute pamphlets was clearly established prior to November 2003. Hill v. Colorado, 530 U.S. at 715; Organization for a Better Austin, 402 U.S. at 419 (1971). Thus, at this stage in litigation, Defendants are not entitled to qualified immunity on Amnesty's claim that its right to distribute leaflets was violated.

It is a closer question whether Amnesty's right to have an audience and be heard at its demonstration was clearly established. All of the caselaw cited above,

25

with the exception of <u>Citizens for Peace in Space</u>, is good authority that predates the November 20, 2003 incident.  <u>Saia</u>, 334 U.S. 558 (1948); <u>Warner Cable Commc'ns</u>, 911 F.2d 634 (11th Cir. 1990); <u>Ward</u>, 491 U.S. 781 (1989).[9]  None of these cases, however, are on all fours with the instant case, and do not clearly elucidate the fact-specific rule that police may not create a police cordon that makes a protest rally totally ineffective.  Prior cases clearly establishing the constitutional violation, however, need not be "materially similar" to the present circumstances so long as the right is "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002).  There need not, however, be a prior case wherein "the very action in question has previously been held unlawful."  <u>Id.</u> at 741 (quoting <u>Anderson</u>, 483 U.S. at 640).  Here, Defendants had fair warning that Amnesty had a clearly established right to assemble, to protest, and to be heard while doing so.

Because Amnesty alleges violations of its clearly established constitutional rights, we hold that the district court erred in concluding that Defendants were entitled to qualified immunity based on the allegations contained in the complaint.

---

[9]Although the discussion of the rights at issue may have been put in general terms in the cited cases, this generality does not deprive these cases of their ability to "clearly establish" the violation of Amnesty's constitutional rights.  <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning . . . .").

## IV. CONCLUSION

We hold that Amnesty's complaint properly alleges a claim for nominal damages for the violation of its constitutional rights, and reverse the district court's dismissal of that portion of the complaint. Because Amnesty failed to allege an injury-in-fact and to establish standing to bring claims on behalf of its members, however, we affirm the dismissal of Amnesty's claims for compensatory damages and its claims brought on behalf of its members.

For the foregoing reasons, we REVERSE IN PART and AFFIRM IN PART the district court's dismissal of the Second Amended Complaint and REMAND for further proceedings consistent with this opinion.

MARCUS, Circuit Judge, specially concurring:

I join fully in the majority's thoughtful and thorough opinion but write separately to emphasize a few things.

As the majority opinion clearly explains, qualified immunity does not protect government officials from a § 1983 civil rights claim if their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quotation marks and citation omitted). Where, as here, there is no controlling case law factually on point, "general statements of the law contained within the Constitution, statute, or case law may sometimes provide fair warning of unlawful conduct." Willingham v. Loughnan, 321 F.3d 1299, 1304 (11th Cir. 2003); Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) ("[T]he words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law."). Thus, "[f]or example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." Vinyard, 311 F.3d at 1350 ("[I]n the absence of fact-specific case law, the plaintiff may overcome the

28

qualified immunity defense when the preexisting general constitutional rule applies with obvious clarity to the specific conduct in question, and it must have been obvious to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time.") (quotation marks and citation omitted); see also Hope, 536 U.S. at 743. Similarly, the reasoning of prior cases may also send "the same message to reasonable officers" in new factual scenarios. Hope, 536 U.S. at 743; Vinyard, 311 F.3d at 1351 ("[S]ome broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.").

Under controlling Circuit law we are obliged, as the majority opinion suggests, to apply a heightened pleading standard to a § 1983 civil rights complaint. See discussion infra; see also Danley v. Allen, 540 F.3d 1298, 1313-14 (11th Cir. 2008); Swann v. S. Health Partners, Inc., 388 F.3d 834, 838 (11th Cir. 2004); Dalrymple v. Reno, 334 F.3d 991, 996 (11th Cir. 2003); Cottone v. Jenne, 326 F.3d 1352, 1362 n.7 (11th Cir. 2003). While heightened pleading may not be altogether consonant with the latest Supreme Court law on pleadings, see Leatherman v. Tarrant County N.I.C.U., 507 U.S. 163, 168-69 (1993) (explaining that heightened pleading standards "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation"); Swierkiewicz v. Sorema,

29

N.A., 534 U.S. 506, 513 (2002) (rejecting a judicially-created heightened pleading standard for employment discrimination complaints, because "complaints in these cases, as in most others, must satisfy only the simple requirements of Rule 8(a)"), we have no occasion to address the matter today because, even when measured against heightened pleading, the allegations contained in this complaint are more than sufficient, if taken as true, to establish a violation of clearly established constitutional law.

There can be absolutely no doubt that the First Amendment rights to assemble, petition the government for redress of grievances, and speak are among our most fundamental, deeply cherished and clearly established constitutional freedoms. Indeed, long-standing Supreme Court case law interpreting the First Amendment has made it abundantly clear that a municipality or its police department may not intentionally and systematically destroy the ability of individuals or groups to assemble, speak, and distribute literature in a public park. The Supreme Court has put police officers on clear notice for more than half a century that protestors on public property have a First Amendment right to peacefully assemble, express their views, and distribute their literature.

The First Amendment itself expressly provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people

30

peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. And, "[i]t has long been established that these First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States." Edwards v. South Carolina, 372 U.S. 229, 235 (1963). "It is also well settled that municipal ordinances adopted under state authority constitute state action and are within the prohibition of the amendment." Lovell v. City of Griffin, 303 U.S. 444, 450 (1938).

As far back as 1939, the Supreme Court made it clear that the rights to assemble and distribute literature -- two of the primary acts Amnesty sought to undertake on November 20, 2003 at the Torch of Friendship -- lie at the heart of the expressive freedoms protected by the First Amendment. Schneider v. New Jersey, 308 U.S. 147, 160 (1939) ("Although a municipality may enact regulations in the interest of the public safety, health, welfare, or convenience, these may not abridge the individual liberties secured by the Constitution to those who wish to speak, write, print, or circulate information or opinion."). In 1943 the Supreme Court again spoke on the subject, reminding us that an ordinance prohibiting leafletting cannot be sustained under the First Amendment, because "one who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly

31

fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word." Jamison v. Texas, 318 U.S. 413, 416 (1943).

Again, in 1969, the Supreme Court made it abundantly clear that a protest march "if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment." Gregory v. City of Chicago, 394 U.S. 111, 112 (1969). Still again, in 1980, the Supreme Court reiterated that a peaceful demonstration, such as the one Amnesty allegedly sought to conduct, is expressive conduct plainly falling within the protections afforded by the First Amendment. Carey v. Brown, 447 U.S. 455, 460 (1980). Indeed, Carey unequivocally said that the "streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." Id. (alteration omitted) (quoting Hudgens v. NLRB, 424 U.S. 507, 515 (1976)). If there was any lingering question about whether police officers could completely prohibit individuals or groups from assembling, speaking, and distributing literature, the Supreme Court put an end to it in 1983 when the Court decreed that "[t]here is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First

Amendment." United States v. Grace, 461 U.S. 171, 176 (1983).

There can be no dispute that Amnesty's conduct -- assembling, demonstrating, and distributing literature -- constituted expressive activities squarely protected by the First Amendment. Nor can there be any doubt that the conduct alleged in Amnesty's complaint utterly and completely eviscerated Amnesty's ability to participate in such expressive activity. The injury expressly alleged is that the Defendants created a barrier to Amnesty's speech so great that it effectively denuded Amnesty of any ability to assemble, demonstrate, speak publicly, or distribute its literature in a public park. The Defendants may as well have locked all of Amnesty's members in a closed room far away from the Torch of Friendship between the hours of 10 a.m. and 2 p.m. on November 20, 2003; if they had been so isolated the members of Amnesty would have had the same opportunity to speak, assemble, and petition as they did from their actual positions on one side or the other of the police cordon allegedly thrown around the Torch of Friendship on November 20, 2003. The allegations detailed in the complaint suggest nothing less than a complete ban on any meaningful First Amendment activity within the cordoned off park, the precise area where Amnesty was permitted by the police to engage in the exercise of First Amendment activity.

Of course, it is also well-established and long-standing constitutional law

33

that there are circumstances when a reasonable time, place, and manner restriction on demonstrations and leafletting in a public park may be valid under the First Amendment. As the Supreme Court explained in Grace:

> "[P]ublic places" historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be "public forums." In such places, the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest.

461 U.S. at 177 (internal citations omitted).

But the conduct alleged in this complaint cannot constitute a valid time, place, and manner restriction on Amnesty's expressive rights. If the complaint is to be believed -- and at this stage in the case we are obliged to accept it as true -- the police did not set about to enforce a reasonable rule designed to ensure the public's safety. Rather, the Defendants are said to have effectively and completely closed off Amnesty's opportunity to speak, assemble, and leaflet in a public park. The police allegedly provided Amnesty with no alternative channel of communication by effectively foreclosing the only venue allowed under the permit. Compare Horton v. City of St. Augustine, 272 F.3d 1318, 1334 (11th Cir.

34

2001); <u>One World One Family Now v. City of Miami Beach</u>, 175 F.3d 1282, 1288 (11th Cir. 1999); <u>ISKCON Miami, Inc. v. Metro. Dade County</u>, 147 F.3d 1282, 1290 (11th Cir. 1998).

There can be no doubt that it is the long-standing and clearly established law of this nation that the government may not grant a permit to a political group instructing it where and when it may assemble, speak and petition with one hand, and then, at the last moment, completely deny the organization the opportunity to utilize that very permit with the other hand. And there can be no doubt that police conduct knowingly designed to so utterly eviscerate fundamental expressive freedoms would violate clearly established constitutional law.

HULL, Circuit Judge, specially concurring:

I specially concur in the judgment reversing the district court's dismissal of Amnesty's Second Amended Complaint.