# Supreme Court of Florida

_____

No. SC2026-0336
_____

**MICHAEL L. KING,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

March 10, 2026

PER CURIAM.

Michael L. King was convicted and sentenced to death for the 2008 murder of Denise Amber Lee. On February 13, 2026, Governor DeSantis issued a death warrant scheduling King's execution for March 17, 2026. King unsuccessfully sought successive postconviction relief in the circuit court and now appeals. We have jurisdiction. *See* art. V, § 3(b)(1), (9), Fla. Const.; *see also State v. Fourth Dist. Ct. of Appeal,* 697 So. 2d 70, 71 (Fla. 1997) (holding "that in addition to our appellate jurisdiction over sentences of death, we have exclusive jurisdiction to review all types

of collateral proceedings in death penalty cases"). For the reasons set forth below, we affirm. We also deny King's motion for a stay of execution.

**I**

In the early afternoon of January 17, 2008, King kidnapped Denise Amber Lee from her home where she was watching her two children, an infant and a toddler. King took Mrs. Lee to his house, bound her with duct tape, and raped and sodomized her. The ordeal lasted over four hours.

Next, King forced Mrs. Lee back into his car. He took her with him to secure supplies to dispose of her body. At some point during the drive, Mrs. Lee, still alive and bound in the backseat of King's car, obtained King's phone and called 911. On the 911 recording, Mrs. Lee is heard crying, begging King to free her so that she could see her husband and children again. Jane Kowalski, who would later identify King at trial, heard screaming coming from a green Camaro that was in the traffic lane beside her, and called 911. King drove Mrs. Lee to an abandoned construction site, shot her in the head, and buried her.

With a description of the green Camaro from Kowalski, officers

pulled King over later that evening and took him into custody. Mrs. Lee's blood, hair, fingerprints, and ring were all recovered from the Camaro. Inside King's home, officers found duct tape with Mrs. Lee's hair attached to it. Two days after the crime, Mrs. Lee's body was recovered. At trial, the medical examiner would testify that she died from a single gunshot wound to the head. The shorts Mrs. Lee was wearing tested positive for sperm, which matched King's DNA profile to the exclusion of 3.5 trillion other individuals.

Following a jury trial, King was convicted of first-degree murder, involuntary sexual battery, and kidnapping. *King v. State*, 89 So. 3d 209, 219 (Fla. 2012). After the penalty phase, the jury recommended by a vote of 12-0 that he be sentenced to death. The trial court agreed and sentenced King to death.

In pronouncing King's sentence, the trial court determined that the State had proven beyond a reasonable doubt the existence of four statutory aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was cold, calculated, and premeditated; (3) the murder was committed for the purpose of avoiding lawful arrest; and (4) the murder was committed while King was engaged in the commission of a sexual

battery or kidnapping. *Id.* at 221. The trial court further determined that King had established the existence of two statutory mitigating circumstances: (1) King's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; and (2) his age at the time of the offense (thirty-six years old). *Id.* The trial court also found thirteen nonstatutory mitigating circumstances. *Id.*[1]

On direct appeal, this Court affirmed King's conviction and death sentence. *Id.* at 232.[2] In addition to rejecting King's specific

---

1. The thirteen nonstatutory mitigating circumstances were: (1) a head injury in 1978; (2) a PET scan with abnormal findings in the frontal lobe, demonstrating a brain injury; (3) an IQ in the borderline range between low-average and mentally retarded; (4) King had repeated grades in school and had been placed in special education classes; (5) despondency and depression in attempting to address King's bankruptcy, unemployment, a failed marriage, an impending foreclosure on his home, and breaking up with his girlfriend; (6) a history of nonviolence; (7) King was a cooperative inmate; (8) he never abused drugs or alcohol; (9) he had a thirteen-year-old son whom he helped raise and for whom he cares; (10) he was a good father; (11) he was a devoted boyfriend; (12) he was a good worker; and (13) he had a close relationship with family and friends. *Id.* at 221-22.

2. King raised the following claims on direct appeal: (1) the trial court improperly limited the cross-examination of State witness Robert Salvador, who went to a firing range with King before the abduction; (2) during guilt-phase closing statements, the prosecution improperly shifted the burden of proof to King to

claims of error, we also concluded that the record clearly supported the convictions for the kidnapping, sexual battery, and first-degree murder of Mrs. Lee. *Id.* The convictions and sentences became final on October 15, 2012, when the United States Supreme Court denied King's petition for writ of certiorari. *King v. Florida*, 568 U.S. 964 (2012).

King then unsuccessfully sought postconviction relief in both state and federal court. In September 2013, King filed a motion to vacate judgment and sentence pursuant to Florida Rule of Criminal Procedure 3.851. Following an evidentiary hearing, the circuit court denied relief on all claims. We affirmed. *King v. State*, 211 So. 3d 866, 870 (Fla. 2017).[3] King was also one of the death row

---

demonstrate that he had not shot Mrs. Lee; (3) nine-millimeter shell casings recovered from the firing range should not have been admitted into evidence; (4) the trial court erred in declining to conduct a hearing on the admissibility of tool-mark identification of fired shell casings, where the weapon that fired the casings was not available; and (5) the trial court erroneously accepted the State's explanation for exercising a peremptory strike to remove a juror. *Id.* at 222-31.

3. This Court denied relief on the following claims from King's postconviction motion: (1) counsel rendered ineffective assistance during the penalty phase because counsel failed to investigate King's possible exposure to toxic substances during his childhood and when he worked as a plumber as an adult; (2) trial counsel

petitioners in *Abdool v. Bondi,* 141 So. 3d 529 (Fla. 2014), who sought to have portions of the Timely Justice Act of 2013 declared unconstitutional. This Court denied relief. *Id.* at 555. In April 2017, King sought habeas relief in federal court. *See King v. Sec'y, Dep't of Corr.,* 793 F. App'x 834, 837 (11th Cir. 2019). The district court denied habeas relief, and following oral argument, the United States Court of Appeals for the Eleventh Circuit affirmed. *Id.* at 836.[4] The United States Supreme Court denied certiorari review. *King v. Inch,* 141 S. Ct. 303 (2020).

---

rendered ineffective assistance because counsel failed to preserve an alleged error under *Batson v. Kentucky,* 476 U.S. 79 (1986), during jury selection; (3) the lethal injection protocol employed by Florida is unconstitutional; (4) section 945.10, Florida Statutes (2014), which exempts from disclosure the identity of those individuals who participate in the lethal injection procedure, is unconstitutional; (5) King may be incompetent by the time he is scheduled for execution. *King,* 211 So. 3d at 880-89.

Finally, during the pendency of King's postconviction appeal, the United States Supreme Court issued *Hurst v. Florida,* 577 U.S. 92 (2016). While agreeing that *Hurst* was applicable, in light of the unanimous jury recommendation as well as the overwhelming and uncontroverted evidence of the four aggravating circumstances and the comparatively weaker mitigating evidence, we concluded that "[i]f any case were to present us with a harmless *Hurst* error, this is it." *King,* 211 So. 3d at 893.

4. King raised, and the Eleventh Circuit rejected, the following three claims: (1) ineffective assistance of counsel for failing to preserve a challenge to a peremptory strike under *Batson* and *J.E.B.*

Governor DeSantis signed King's death warrant on February 13, 2026, scheduling the execution for March 17, 2026. On February 17, 2026, the Circuit Court for the Twelfth Judicial Circuit held a case management conference, where King was represented by counsel. The same day, King directed a records demand to the Florida Department of Corrections (FDOC) under Florida Rule of Criminal Procedure 3.852(h) and (i). FDOC filed a response and objections, and following a hearing, the circuit court denied King's demand.

On February 22, 2026, King filed a successive postconviction motion, as well as a separate motion seeking to stay the execution. He raised two claims: (1) FDOC's failure to follow the published execution by lethal injection procedures is a violation of King's Fourteenth Amendment rights under the United States Constitution

---

*v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994); (2) ineffective assistance of counsel for failing to investigate King's exposure to toxic substances; and (3) the district court violated due process or otherwise abused its discretion by adopting portions of the State's response brief in its order denying King's habeas petition.

as well as his rights under the Florida Constitution;[5] and (2) his execution will violate his Eighth Amendment rights because newly discovered evidence shows "King is a man with humanity," "his life has great value," and "his case is not among the most aggravated and least mitigated." Following a *Huff*[6] hearing, the circuit court issued a written order finding that King was not entitled to any relief on February 27, 2026.

King appealed to this Court. He raises two claims: (1) the trial court abused its discretion in denying King's demand for additional records, resulting in violations of his equal protection and due process rights under the Fourteenth Amendment; and (2) newly discovered evidence shows that carrying out King's death sentence would violate his Eighth Amendment rights. King asks us to vacate his death sentence, or alternatively, to stay his execution and remand to the circuit court for an evidentiary hearing.

---

5. In this claim, King also asked the circuit court to reconsider its decision denying his records demand.

6. *Huff v. State*, 622 So. 2d 982, 983 (Fla. 1993) (requiring the circuit court to conduct a hearing to determine whether an evidentiary hearing is necessary to resolve a death penalty defendant's postconviction claims).

## II

We have consistently said:

> Summary denial of a successive postconviction motion is appropriate if the motion, files, and records in the case conclusively show that the movant is entitled to no relief. We review the circuit court's decision to summarily deny a successive rule 3.851 motion de novo, accepting the movant's factual allegations as true to the extent they are not refuted by the record, and affirming the ruling if the record conclusively shows that the movant is entitled to no relief.

*Zakrzewski v. State*, 415 So. 3d 203, 208 (Fla.) (quoting *Tanzi v. State*, 407 So. 3d 385, 390 (Fla. 2025)), *cert. denied*, 146 S. Ct. 57 (2025). Applying this standard, we affirm the circuit court's summary denial of King's successive postconviction motion.

### A

King challenges the circuit court's denial of his demand for additional records from FDOC. He sought these records to support his claims "for violation of his equal protection rights based on the maladministration of the lethal injection protocol[]."[7] In advancing these claims, King directs us to evidence submitted in a federal

---

7. *See generally* Fla. Dep't of Corr., *Execution by Lethal Injection Procedures* and *Certification Letter* (2025), https://fdc-media.ccplatform.net/content/download/1561/file/Execution%20by%20Lethal%20Injection%20with%20Certification%20Letter.pdf.

lawsuit brought by Frank Walls, who was executed on December 18, 2025, after this Court and the United States Supreme Court denied relief. These are the same documents this Court recently addressed in the postconviction appeals of since-executed inmates Ronald Heath and Melvin Trotter.[8] They include logs listing fields such as "drug name," "package size," "date," "expiration date," "received/used," and "balance," among others. Citing section 945.10, Florida Statutes, the State redacted the fields for "invoice name/#," "lot," and "MFR."

Like Heath and Trotter, King says these records "raise substantial questions regarding FDOC's compliance with [its] protocol[] and ability to carry out future executions by lethal injection." Specifically, King contends these records show that, in the executions of two other inmates, "lower amounts of the required drugs were used." Relying on these records and assertions, King submits that he has made out viable due process and equal protection claims. He argues that the circuit court abused its

---

8. *See Heath v. State*, No. SC2026-0112, 2026 WL 320522, at *3 (Fla. Feb. 3), *cert. denied*, 2026 WL 363902 (U.S. Feb. 10, 2026); *Trotter v. State*, No. SC2026-0214, 2026 WL 444544, at *2-3 (Fla. Feb. 17), *cert. denied*, 2026 WL 504237 (U.S. Feb. 24, 2026).

discretion in denying his demand for additional public records, purportedly made in furtherance of this Fourteenth Amendment claim.

Upon careful review, we find no error, *see Muhammad v. State*, 132 So. 3d 176, 200 (Fla. 2013), and conclude that King is not entitled to relief on this claim.

**1**

King's public records demand was made under Florida Rule of Criminal Procedure 3.852(h) and (i), which permit counsel for a defendant subject to a death warrant to request the production of certain public records. Fla. R. Crim. P. 3.852(h)(3). "[T]his discovery tool is not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief." *Sims v. State*, 753 So. 2d 66, 70 (Fla. 2000). So the rule prescribes meaningful limitations to records requests:

> [R]ecords requests under Rule 3.852(h) are limited to "persons and agencies who were the recipients of a public records request at the time the defendant began his or her postconviction odyssey," whereas, records requests under Rule 3.852(i) must "show how the requested records relate to a colorable claim for postconviction relief and good cause as to why the public records request was not made until after the death warrant was signed."

*Dailey v. State*, 283 So. 3d 782, 792 (Fla. 2019) (citations omitted) (quoting *Bowles v. State*, 276 So. 3d 791, 795 (Fla. 2019)).

King's argument that he is entitled to additional records begins with his assertion that the Walls documents reveal "numerous apparent errors" and "maladministration by FDOC of [its] protocol[]." And based on the Walls documents, King submits that his demand for additional records is necessary to pursue his own claims for postconviction relief, targeting the alleged maladministration of the protocol. King sought various records, checklists, and logs relating to the procedures for the use and maintenance of the chemicals used in the lethal injection protocol. These included requests relating to drug expiration dates, storage temperatures, protocol in the event of power loss, information as to the training of individuals carrying out the execution, and information regarding how the State assesses and monitors the inmate's consciousness during the execution. Importantly, given King's suggestion that the State has engaged in "disparate treatment of individuals facing execution for first[-]degree murder as well as sex offenses," his assertions about maladministration are not limited to individuals in that category, and nothing in the record

before us reflects separate record-keeping for such individuals.

It would require speculative inferences to conclude from these logs that the State will fail to administer the capital punishment protocol in King's case. The relevant log lists "drug name," "package size," "date," "expiration date," "received/used," and "balance." Information about the expiration date of the drugs and amount of drugs in inventory is shown unredacted. King conjectures that because some of the dates on these logs are "around the date" of previous executions, the balance entries for those dates correspond to the doses actually administered at the contemporaneous executions. Yet that information reflects only the quantity of drugs withdrawn from or deposited in inventory; those amounts need not and likely do not match the amounts administered. *See Heath*, 2026 WL 320522, at *3 (addressing the same logs and explaining that the "suggestion that inventory removals on dates that seemingly correspond to executions and reflect amounts less than required by the protocol show that incorrect doses were used is speculative" (citation modified)). The circuit court did not err in denying relief.

**2**

More fundamentally, because King has not asserted a colorable claim for relief regarding any constitutionally redressable disparate treatment, we find no error in the circuit court's decision to deny his demand for records or his motion to vacate his judgment and sentence.

As to the records claim specifically, it is King's burden to demonstrate that the records sought relate to a colorable claim for postconviction relief. *Branch v. State*, 236 So. 3d 981, 984 (Fla. 2018). In *Heath*, admittedly in assessing an Eighth Amendment claim, we explained that an "alleged failure to document the removal of drugs from inventory until one or two days after an execution would not, without more, show a substantial and imminent risk that is sure or very likely to cause serious illness and needless suffering during an execution." 2026 WL 320522, at *3. Here, in assessing King's Fourteenth Amendment claim, our reasoning is similar: alleged failures in documenting the movement of drugs into and out of inventory does not give rise to a cognizable equal protection or due process injury.

That is because, first, as the circuit court correctly found, even an allegation that there was a difference in the quantity of the specific drugs administered would not constitute disparate treatment for Fourteenth Amendment purposes. *See DeYoung v. Owens*, 646 F.3d 1319, 1327-28 (11th Cir. 2011) (holding equal protection does not "require[] a written execution protocol sufficiently detailed to ensure that every execution is performed in a precisely identical manner").[9] King is right that "we have a constitutional responsibility to ensure the death penalty is

_____

9. Even positing King's speculation that the records support the inference that other inmates received varying doses of rocuronium and potassium acetate, those drugs are administered after the inmate has been rendered unconscious by etomidate. *See Rogers v. State*, 409 So. 3d 1257, 1268 (Fla.) (noting the "well-established fact that the administration of etomidate will render [the defendant] unconscious likely within one minute"), *cert. denied*, 145 S. Ct. 2695 (2025); *Cole v. State*, 392 So. 3d 1054, 1065 (Fla.) (noting that the "etomidate protocol . . . includes safeguards to ensure the condemned is unconscious throughout the execution"), *cert. denied*, 145 S. Ct. 109 (2024); *Baze v. Rees*, 553 U.S. 35, 64 (2008) (Alito, J., concurring) ("The first step in the lethal injection protocols currently in use is the anesthetization of the prisoner. If this step is carried out properly, it is agreed, the prisoner will not experience pain during the remainder of the procedure."); *Valle v. Singer*, 655 F.3d 1223, 1233 (11th Cir. 2011) (noting that under Florida's protocol, a consciousness check is required and "the execution cannot proceed until the individual is rendered unconscious").

administered in a fair, consistent and reliable manner . . . ." *Arbelaez v. Butterworth*, 738 So. 2d 326, 326-27 (Fla. 1999).[10] But he has not asserted a divergence from protocol that would result in a manner of execution that would raise equal protection concerns. *See Ferguson v. Warden*, 493 F. App'x 22, 26 (11th Cir. 2012) ("Under Florida's . . . protocol, all death row inmates facing execution will be subject to the same sequence of drugs, the same procedures, and the same safeguards in the execution process.").

And second, King has not alleged that the State will treat him disparately from other similarly situated persons in the sense that is relevant to the Fourteenth Amendment. "The Equal Protection Clause requires the government to treat similarly situated persons in a similar manner." *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1305 (11th Cir. 2009). King has made no substantive allegation that administration of the protocol will amount to disparate treatment from other similarly situated persons. *See Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1180

---

10. The rest of that sentence reads, "as well as having an administrative responsibility to work to minimize the delays inherent in the postconviction process." *Id.*

(11th Cir. 2009). Nor can he allege that his execution burdens his fundamental rights or is based on his membership in a suspect class. For these reasons, the circuit court properly concluded that King failed to establish even the first requirement of a viable equal protection claim.

King's due process challenge fares no better. He claims that "[b]ecause [he] has been denied access to the records he demanded," he has been hindered in his ability to pursue his equal protection claim; therefore, "his due process rights have been violated." This Court has previously rejected efforts to morph a challenge to the denial of a public records demand into a constitutional challenge. *Randolph v. State*, 422 So. 3d 166, 172 (Fla.) (collecting cases), *cert. denied,* 2025 WL 3236523 (U.S. Nov. 20, 2025). King does not allege that he was not afforded notice and an opportunity to be heard. To the contrary, the circuit court held a hearing on the demand, and King's counsel presented argument on the issue. And in denying King's successive motion for postconviction relief, the circuit court gave written reasons for not reconsidering its denial of the demand.

The circuit court was correct to summarily deny this claim.[11]

**B**

King next argues that newly discovered evidence shows that carrying out his death sentence would violate his Eighth Amendment rights because he is "a man with humanity," "his life has great value," and "his case is not among the most aggravated and least mitigated." In support of this claim, King submits correspondence with spiritual advisors and friends, while generally making policy arguments against capital punishment. He further argues that his "life is tragic and mitigating." On this claim, King contends that the circuit court erred in not conducting an evidentiary hearing and asks us to remand for that purpose. We agree with the circuit court that this claim is untimely, procedurally barred, and meritless.

King's claim is untimely because the allegedly "newly discovered evidence" was ascertainable long ago by the exercise of

---

11. We take King at his word that, regarding this matter, he "has not raised an Eighth Amendment claim." So we do not analyze the merits of such a claim here. We note only that the circuit court correctly observed that King's allegations are substantively identical to the Eighth Amendment challenges we rejected in *Trotter* and *Heath*.

due diligence. *See Dailey v. State*, 279 So. 3d 1208, 1212-13, 1215 (Fla. 2019); Fla. R. Crim. P. 3.851(d)(2)(A). King makes no attempt to even argue that he has submitted "new" evidence that could not have been obtained long ago. Nor does he take issue with the circuit court's analysis correctly observing as much. And in fact, the evidence that he has submitted in support of this claim, correspondence from friends and spiritual advisors, reveals that he has had relationships with these individuals for years. So to the extent these individuals could speak about King, nothing has stopped him or his counsel from mounting this evidence long before the signing of his death warrant.

King's claim is procedurally barred because, to the extent it asks that we "reassess King's life with the mitigation already found by the trial court," it seeks relief that we considered and rejected when we affirmed King's conviction and death sentence. *King*, 89 So. 3d at 231-32; *see also Turner v. Dugger*, 614 So. 2d 1075, 1078 (Fla. 1992) (barring postconviction claims, or variations thereof, that have been raised on direct appeal).

In any case, the claim is meritless. On direct appeal, we recounted the facts supporting the trial court's decision that this

presented an especially aggravated case. *King*, 89 So. 3d at 231.

We have no reason to revisit that conclusion. The circuit court correctly denied relief on this claim.

## III

We affirm the summary denial of King's motion for postconviction relief. We deny his concurrent motion to vacate his death sentence or stay the execution for an evidentiary hearing.

No motion for rehearing will be entertained by this Court. The mandate shall issue immediately.

It is so ordered.

MUÑIZ, C.J., and LABARGA, COURIEL, GROSSHANS, FRANCIS, SASSO, and TANENBAUM, JJ., concur.

An Appeal from the Circuit Court in and for Sarasota County,
    Thomas W. Krug, Judge – Case No. 582008CF001087XXXANC

Eric C. Pinkard, Capital Collateral Regional Counsel, Ali A. Shakoor, Assistant Capital Collateral Regional Counsel, and Debra R. Bell, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, Scott A. Browne, Chief Assistant Attorney General, Tampa, Florida, and Timothy A. Freeland, Special Counsel, Assistant Attorney General, Tampa, Florida,

    for Appellee