PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and the sentences imposed by the trial court.
FACTS AND PROCEDURAL HISTORY
On February 6, 2008, Michael L. King was indicted on one count of first-degree murder for the killing of Denise Amber Lee. The trial court record reflects that on January 17, 2008, at approximately 3:30 p.m., Nathan Lee returned to his home on Latour Avenue in North Port, Florida, to find his wife, Denise Amber Lee, missing. The doors were locked, but her keys, purse, and cellular telephone were in the house. The couple’s two sons, ages six months and two years, were in a crib together, which was not typical. At around 4 p.m. that day, Detective Chris Morales of the North Port Police Department was notified that Denise Lee was missing. When Morales responded to the home on Latour Avenue, he found no signs *213 of forced entry or a struggle, and the children were unharmed.
Earlier that day, between 1 and 2 p.m., a neighbor of the Lees was watching television from a position which provided a view of the street. During that time, she saw a green Camaro “creeping up and down my road going very slow.” The Camaro had a black “car bra,” which is a leather or vinyl casing across the front of the car which protects against impact from insects or rocks. The neighbor observed the car circle the street four or five times. When the neighbor walked outside to investigate because the driver appeared to be lost, the car pulled into the Lees’ driveway. The neighbor made eye contact with the driver but, believing that the operator of the vehicle had found the residence he was looking for, she returned to her house. Ten or fifteen minutes later, the neighbor again stepped outside and saw the Camaro depart from the Lees’ residence. The neighbor did not observe Denise Lee entering or being forced into the Camaro.
Later that day, between the hours of 5:30 and 6 p.m., Michael King unexpectedly arrived at the home of his cousin, Harold Muxlow. King was wearing a white shirt with a design. King asked Muxlow for a flashlight, a gas can, and a shovel, explaining that his lawnmower was stuck in his front yard. After Muxlow provided King the tools, King immediately left. As Muxlow was walking back to his house, he heard a female voice from the vehicle exclaim, “Call the cops.” Muxlow turned around and walked down the driveway toward King, asking what he was doing. King lifted his head from beside the passenger side of the car and replied, “Nothing, don’t worry about it.” Muxlow initially turned and began to walk toward his house but, curious, he turned around once again and walked to the edge of the street toward the car. There, he saw King crawling over the console in the Camaro and pushing the head of a person with shoulder-length hair down in the back seat. He also observed part of the person’s knee rise up. King then climbed into the driver’s seat and drove away.
Thinking the incident was suspicious, Muxlow drove to King’s residence to investigate if King had returned and whether a lawnmower was in fact stuck in the yard. When Muxlow arrived, he found neither King’s green Camaro nor a lawnmower in King’s yard. Muxlow placed an anonymous 911 phone call in which he provided a description of King’s vehicle and informed the dispatcher that a person might be in the described vehicle against her will.
At 6:14 p.m., the Sarasota County Sheriffs Office received another 911 call. During trial, the parties stipulated that the female voice on this 911 call was that of Denise Lee. Harold Muxlow testified that a second, male voice also present on the 911 recording was that of his cousin, Michael King. The recording of the 911 call presented during trial was transcribed by the court reporter as follows:[1]
DISPATCHER: 911.
[LEE: I’m sorry. I’m sorry. I just want to go — ]
DISPATCHER: Hello?
[LEE: I’m sorry. I just want to see my family.]
*214 MALE VOICE: Why did you do that?
LEE: I’m sorry. [I just want to see my family.]
DISPATCHER: Hello?
LEE: I just want to see my family again. Please.
DISPATCHER: Hello? Hello?
LEE: I just want to see my family again. Let me go.
DISPATCHER: Hello?
MALE VOICE: (Inaudible) the f* *king phone.
LEE: Please let me go. Please let me go. Please let me see my family again.
MALE VOICE: No f* *king problem. LEE: Okay.
DISPATCHER: Hello?
(Inaudible).
LEE: I’m sorry.
[MALE VOICE: I was gonna let you go and then you go f* *k around.]
LEE: [I’m sorry. Please] let me go.
MALE VOICE: Where’s my phone?
DISPATCHER: Hello?
[MALE VOICE: Now I’ve got to go to the next street because of him.]
LEE: I’m sorry. Please let me go.
MALE VOICE: What are you doing?
(Inaudible)
LEE: Please let me go, please. Oh, God, please.
[MALE VOICE: (inaudible) in front of my cousin Harold.]
DISPATCHER: Hello?
LEE: Please let me go, [God] please.
MALE VOICE: I told you I would.
DISPATCHER: Hello?
LEE: Help me.
DISPATCHER: What’s the address?
LEE: Please help me.
DISPATCHER: What’s the address that you’re at? [ (to supervisor): Coming off the North Port Tower.]
LEE: Please.
MALE VOICE: I’m not (inaudible).
DISPATCHER: Hello?
LEE: Please let me go.
DISPATCHER: What is the address that you’re at? Hello, ma’am?
LEE: Where are we going?
MALE VOICE: I’ve got to go up and around now because of what you did.
LEE: Up and around where?
MALE VOICE: Didn’t you see (inaudible). Exactly four streets — well, five streets over from your house.
LEE: I couldn’t tell (inaudible).
DISPATCHER: What’s your name, ma’am? Hello? What’s your name?
LEE: Please. My name is Denise. I’m married to a beautiful husband, and I just want to see my kids again.
DISPATCHER: Your name’s Denise?
LEE: I’m sorry.
DISPATCHER (to supervisor): I’m thinking too, that he doesn’t know.
LEE: Please, God. Please protect me.
DISPATCHER: Are you on 1-75?
LEE: Where are we?
[MALE VOICE: What did you do with my cell phone?]
LEE: I don’t know. Please. Protect me, please.
DISPATCHER: Where are you at? Can you tell if you’re on 1-75?
LEE: I don’t know where your phone is. I’m sorry.
[MALE VOICE: You be honest with me.]
LEE: Can’t you just tell me where we are?
DISPATCHER: Are you blindfolded? If you are, press the button.
*215 LEE: I don’t have your phone. Please, God.
(Inaudible).
LEE: I don’t have it. I’m sorry.
DISPATCHER: Denise? Do you know this guy?
[MALE VOICE: Be honest.]
LEE: I don’t — I don’t have it. I’m sorry.
DISPATCHER: Denise, do you know this guy? (to supervisor: She might have the phone laid down and not hear a thing I’m saying too. He keeps saying a phone.)
LEE: I don’t know where it is. Maybe if I could see I could help you find it. (Inaudible).
[LEE: No, sir.]
DISPATCHER: Denise?
LEE: I’m looking for it. Uh-huh?
DISPATCHER: How long have you been gone from your house?
LEE: I don’t know.
DISPATCHER: How long?
LEE: I don’t know.
DISPATCHER: Do you know how long you’ve been gone from your house? (Inaudible).
DISPATCHER: What’s your last name?
LEE: Lee.
DISPATCHER: Lee?
LEE: Yeah.
DISPATCHER: Do you know—
LEE: I don’t know where your phone is.
DISPATCHER: Your name is Denise Lee?
LEE: Uh-huh.
DISPATCHER: Can you tell at all what street you’re on?
LEE: No.
DISPATCHER: Do you know this guy that’s with you?
LEE: No.
DISPATCHER: You don’t know him from anywhere?
LEE: No. Please. Oh, God, help me.
DISPATCHER: What’s your address? What’s your home address; do you know?
(Inaudible).
LEE: I don’t know. Please just take me to my house. Can you take me home, on Latour, please?
DISPATCHER: Can you see or do you have a blindfold on?
LEE: I can’t see. Where are we? (Inaudible). ' ■
DISPATCHER: Can they turn off the radio or turn it down?
LEE: I can’t hear you. It’s too loud. Where are we?
(Inaudible).
LEE: Are you going to hurt me?
MALE VOICE: Give me the phone.
LEE: Are you going to let me out now?
MALE VOICE: As soon as I get the phone.
LEE: Help me.
At that moment, the call was terminated. The cellular telephone number from which the 911 call was dialed was identified as belonging to Michael King. Law enforcement proceeded to King’s residence in North Port and forcibly entered the premises; however, neither Lee nor King was there.
During the early evening of January 17, while Shawn Johnson was stopped at a traffic light, he heard an adult female voice screaming for help. At- the North Port police station, Johnson subsequently selected Michael King from a photo lineup as the man who was operating the green Cá-maro from which the screams for help *216 were emanating. Johnson also identified King as the driver during trial.
On that same day, at approximately 6:30 p.m., Jane Kowalski was stopped at a traffic light on Highway 41 when she heard someone screaming and a “commotion” coming from the Camaro that was in the traffic lane beside her. Kowalski made eye contact with the male driver of the Camaro. She subsequently identified Bang from a photo lineup and also during trial as the man who was driving the car. Kowalski described the screaming as, “Horrific, terrified. I’ve never ever heard anything like that in my life.” As she watched, the man driving the Camaro turned around and began to push something down in the backseat. After the driver finished the downward motion, Kowalski saw a hand rise up from the back seat and begin banging loudly on the passenger-side window. When the traffic light turned green, Kowalski hesitated with the intent to be in a position to read the license plate of the Camaro as it passed. However, King refused to drive forward and, when Kowalski began to slowly roll forward, he changed traffic lanes and pulled behind her. When Kow-alski realized that King would not pass her, she dialed 911 and described her observations of the Camaro and the behavior of the driver. While speaking with the dispatcher, Kowalski observed the Camaro make another lane change and then make a left turn onto Toledo Blade Boulevard, heading toward Interstate 75. Due to the traffic, she was unable to change lanes and follow the Camaro.
At 9 p.m. that evening, Deputy Christian Wymer and State Trooper Edward Pope were posted at Toledo Blade Boulevard near Interstate 75 watching for a green Camaro. From a series of “be on the lookout” (BOLO) announcements, the officers had a description of the car, a license plate number, and driver’s license photos of Lee and King. At approximately 9:10 p.m., a green Camaro matching the description given in the BOLO drove from Toledo Blade Boulevard onto the on-ramp for 1-75 southbound. Trooper Pope followed the Camaro and eventually caused it to stop. Based upon the information he had at that time, Pope conducted a felony stop, i.e., he placed his vehicle in a tactical position and drew his weapon. He ordered the driver to exit the vehicle multiple times, but the driver did not comply. Only after a fifth command, during which Pope advised that if the driver did not comply, he (Pope) would fire into the vehicle, the door opened and the driver exited from the front door backwards, leaning over the console toward the passenger seat. Pope identified the driver as a “perfect match” to the person on Michael King’s driver’s license.
During the stop, Pope observed that King was wet from the waist down and had mud resin on the base of his shoes. King was wearing jeans and a shirt with a camouflage pattern.[2] In King’s pockets, Pope discovered a wallet that contained King’s driver’s license with a photo that matched the picture that Pope had previously received. Pope also recovered a cellular phone, from which the battery and the SIM card had been removed. On the bra of the Camaro, Pope observed hair strands, and he also observed hair strands on the spoiler with what appeared to be blood pellets. A viscous, sap-like substance was present on the bra of the car. *217 Inside the vehicle, Pope observed a gas can on the passenger seat and a cellular phone battery on the passenger-side floorboard. Pope observed a blanket and a ring in the backseat; however, Lee was not in the car. During trial, the parties stipulated that the ring found in the backseat of the Camaro belonged to Denise Lee.
After the car was towed to the North Port Police Department, a shovel with dirt caked on the underside was discovered in the back seat. During trial, Harold Mux-low identified the shovel as the one that he gave King on the afternoon of January 17. A palm print found on the outside of the driver’s-side window of the Camaro was identified as belonging to Denise Lee. DNA testing on the hair recovered from the outside of the Camaro matched the known profile of Lee to the exclusion of 110 trillion other Caucasians. Hair found in the backseat of the Camaro matched Lee’s DNA to the exclusion of 9 trillion other individuals. The blanket located in the backseat tested positive for blood and matched Lee’s DNA to the exclusion of 9 trillion other individuals. Blood found on the outside of the Camaro matched the DNA profile of Denise Lee at the ten loci the DNA technician was able to derive from the sample. Similarly, the sap-like substance found on the bra of the Camaro matched the known DNA profile of Denise Lee at the eight loci the technician was able to derive from the swabbing.
After a search warrant was obtained, a thorough search of King’s home was conducted. Upon entering the house, an evidence technician observed that there were a number of rectangular mirrors hanging on the wall side-by-side in the dining room; however, there was also one set of hooks on the wall not supporting a mirror. Upon entering the master bedroom, the technician noted that a yellow blanket covered the window. A Winnie the Pooh blanket, pillows, and a wad of duct tape with hair attached were on the floor. Directly across from the pillows and the blanket, a mirror identical to those hanging in the dining room was propped against the wall.
In the kitchen, the technician observed an intact roll of duct tape on the bar. A garbage bag in the pantry contained more duct tape with hair attached. The hairs that were attached to the duct tape in the garbage bag matched the known DNA profile of Denise Lee to the exclusion of 110 trillion other Caucasians. Swabs taken from the ends of the wadded duct tape located in the master bedroom matched the DNA profile of Michael King to the exclusion of one quadrillion other Caucasians. The Winnie the Pooh blanket found in the master bedroom tested positive for blood and semen. The semen on the blanket matched the known DNA profile of King to the exclusion of 1.1 quadrillion other individuals, and Lee could not be excluded as the contributor of the blood.
On January 18, during the subsequent effort to locate Denise Lee, an individual involved in the search noticed an area of land near Plantation Boulevard in North Port where the earth appeared to be disturbed. In the vicinity of the disturbed area were two small piles of sand that were out of place for the normal terrain. In those two piles of sand were what appeared to be blood. According to a crime scene technician, it appeared that the blood had been on the ground previously and the sand had been placed on top of the blood because the sand had absorbed the blood. A forensics team commenced the excavation of the disturbed area on the morning of January 19. As the team removed the earth, they noticed scallop marks, which were consistent with a round-nose shovel digging straight down into the earth. At a depth of three feet *218 one inch, the team discovered the nude body of Denise Lee, lying on her side in a fetal position. A gunshot wound was visible on the body, and there was water in the bottom of the hole.
A couple of days after the body of Lee was recovered, a single nine-millimeter shell casing was discovered in the grass near the gravesite, but a projectile was never found. A couple of hundred yards away from the gravesite, a crime scene technician recovered a pair of boxer shorts owned by Nathan Lee — but often worn by Denise Lee — and a shirt belonging to Denise Lee. The boxer shorts tested positive for sperm cells, and those cells matched the DNA profile of King to the exclusion of 3.5 trillion other individuals.
During the trial, State witness Robert Salvador testified that on the day of the abduction, he and King engaged in target practice at a local firing range. The sign-in sheet for the range reflected times of 11:57 a.m. for Salvador and 11:58 a.m. for King. Upon arriving at the range, Salvador observed King remove a nine-millimeter handgun from under the passenger seat of his Camaro. Salvador and King stayed at the range for approximately one hour and, during that time, King fired at least three weapons — his own nine-millimeter handgun, Salvador’s nine-millimeter handgun, and one of Salvador’s twenty-two caliber handguns. King did not bring any ammunition to the firing range, so Salvador allowed King to use his ammunition. Salvador believed that when the duo left the range, there was no more ammunition in King’s gun, but also testified that there were times when Salvador was not looking when King could have taken ammunition from Salvador’s supply. On the return to their vehicles, Salvador carried King’s pistol in a bag because range rules prohibited the open carrying of firearms. King’s nine-millimeter handgun was returned to its original position under the passenger seát of the Camaro.
During the investigation, Salvador met law enforcement officials at the range and identified the location where he and King had been firing. With Salvador’s assistance, the North Port Police Department collected forty-seven nine-millimeter shell casings from the tables and the ground where King and Salvador had been firing on January 17. A crime analyst from the Florida Department of Law Enforcement confirmed that the tool-marks on the casing found near the burial site matched the tool-marks on three of the forty-seven casings collected from the firing range. However, no DNA was recovered from the shell casing discovered at the burial site, and the weapon from which these casings had been fired was never found.
The medical examiner testified that Denise Lee died from a single gunshot wound to the head. The size of the wound indicated that the bullet could not have been larger than one centimeter, and that the projectile that caused the injury could have been from either a nine-millimeter or a thirty-eight caliber weapon. Further, the wound was consistent with the gun having been placed against Lee’s head at the time it was fired. The location of the entrance wound, to the right of Lee’s right eyebrow, led the medical examiner to conclude that the gun would have been in Lee’s field of vision if her eyes were open. The medical examiner further explained that when the gun was discharged, Lee’s eye exploded, and he opined that the sap-like substance located on the bra of the Camaro could have been Lee’s ocular fluid. According to the medical examiner, there was aspirated blood in Lee’s lungs, which indicates that Lee continued to breathe for a period of time after the wound was inflicted.
*219 With regard to the rest of Lee’s body, two pieces of duct tape were removed from her hair during the autopsy. The medical examiner found bruises on Lee’s wrists and, due to their same general location on each wrist, concluded that they could have been caused by ligatures and were consistent with defensive injuries. The medical examiner noted that Lee had vaginal bruising and anal tearing, both of which were caused by insertion trauma. The medical examiner concluded from the condition of the injuries that they were inflicted pre-mortem and were nonconsensual. Semen recovered from Lee’s vagina matched the DNA profile of King to the exclusion of 1 quadrillion other Caucasians.
The jury convicted King of first-degree murder, involuntary sexual battery, and kidnapping.
During the penalty phase, the State offered victim impact statements from Lee’s father and Lee’s husband. King offered the testimony of Dr. Joseph Chong Sang Wu, who conducted a PET scan on King. According to Wu, the PET scan demonstrated abnormal activity within his frontal lobe. Wu concluded that this abnormal activity was consistent with a traumatic brain injury. The PET scan also revealed an abnormal notch or divot in King’s frontal lobe at the top of his head. Wu testified that when King was six years old, he suffered a head injury in a sledding accident, and his siblings reported that his behavior changed significantly after that incident. Wu testified that individuals who suffer frontal lobe injuries are more likely to have poor judgment, exhibit blunted affect, take excessive risks, have difficulty regulating impulses such as aggression, and have difficulty separating fantasy from reality. With regard to the latter, Wu was provided with statements from family members reporting that when King was seventeen, after watching the movie The Texas Chainsaw Massacre, he obtained a chainsaw and started chasing family members with it, while exhibiting no expression on his face. At the age of thirteen, while acting out a cartoon, King nearly killed his brother with a bow and arrow. After the sledding injury, King required special education services. According to Wu, King’s most recent verbal IQ score placed him in the borderline retarded range.
King also suffered from headaches and buzzing in his head, both of which were exacerbated by stress. In December 2007, after breaking up with a girlfriend, facing bankruptcy along with the loss of his Florida home, and being unemployed for a prolonged period of time, King began to behave strangely, as if dazed. At times he appeared to be in a catatonic state. Family members testified that he became paranoid during that time. Further, a second girlfriend stated that on January 15, 2008 (two days before the abduction), King’s behavior was becoming more extreme in that he believed the neighbors were looking in the windows.[3] Wu concluded that, due to the frontal lobe injury, King demonstrates a significant impairment in his ability to conform his behavior to the requirements of law. On cross-examination, however, Wu admitted that he had not been provided with information about King’s affect or behavior on January 17 or 18.
King’s siblings, his father, and his sister-in-law testified further as to King’s sledding accident and his strange, risk-taking behavior after that incident. Furthermore, the family and King’s girlfriends testified that they never saw King abuse *220 drugs or alcohol. Testimony was presented that King was a successful plumber, he tried to lead an honest life, and he never became violent with women, even when the earlier girlfriend who broke up with King was the aggressor and struck him. King’s sister-in-law testified that King’s wife left him for a man she met on the Internet, after which King obtained custody of their son. When King returned to Florida in early 2008 to attempt to redeem his house from foreclosure, the son remained with King’s brother and sister-in-law in Michigan. The son, who was thirteen at the time of the penalty phase, is currently an excellent student in Michigan, but has attended counseling to help him cope with his mother’s departure and his father’s actions.
A records custodian at the Sarasota Sheriffs Office testified that during the entire time King was incarcerated, he never received a disciplinary report. A jail deputy also testified that King’s behavior had been good.
Dr. Kenneth Visser performed an IQ test on King, which produced a verbal IQ score of 71, a performance IQ score of 85, and a full scale IQ of 76. This placed King in the borderline intellectual functioning range. However, on cross-examination, Visser opined that the ability of King to concentrate was actually stronger than the IQ score indicated. Visser stated that King was strong in important areas such as comprehension of why laws are necessary and why certain rules are in place. King was also strong in his ability to look at a situation, understand its natural progression, and predict the consequences. Visser testified that he did not perform validity testing to detect whether King was malingering. On redirect examination, Visser referred to King’s childhood education records which demonstrated that he was held back in first grade, that at age eight he could not write all of the letters of the alphabet, and that a social worker in 1984 recommended that King continue his placement as a special-education student.
The State presented Dr. Michael Ga-mache, who testified that he conducted psychometric tests on King to evaluate his cognitive skills. A validity test administered to King indicated that he was not applying full effort and, therefore, Ga-mache concluded that the test results were not reliable as an indication of King’s actual abilities.[4] Gamache also administered an IQ test to King, which produced a full scale IQ of 76. However, Gamache testified that IQ scores tend to remain stable throughout one’s lifetime, and when King took IQ tests in 1979 and 1984 — both after the sledding accident — he received full IQ scores of 85 and 82, respectively. Ga-mache opined that King’s true IQ score is likely in the low average range, or somewhere in the 80s.
Gamache disagreed with Wu that some of King’s symptoms reported by his girlfriends and family were consistent with frontal lobe damage. For example, Ga-mache testified that paranoia and difficulty separating fantasy from reality are symptoms atypical of frontal lobe damage, but rather are a sign of psychosis. Further, he asserted that blunted affect is not indicative of frontal lobe damage. Instead, inappropriate affect is more common because it is consistent with the inability to control impulses. Based upon his evalua *221 tion of King and the records he reviewed— which included correspondence between King and family members, employment records, interviews and deposition transcripts, and competency evaluations — Ga-mache concluded that King’s ability to conform his conduct to the requirements of the law is not substantially impaired.
Finally, the State presented the testimony of Detective Chris Morales who was in the presence of King for eight or nine hours on January 17 and 18, 2008. Morales testified that during that time, King was lucid, conversational, and appeared normal. On cross-examination, Morales acknowledged that during one phone call to his brother, King spoke of a conspiracy that he was going to be raped, beaten, and murdered by the jailers and urged his brother to call 911 from Michigan.
On September 4, 2009, the jury recommended a death sentence by a vote of twelve to zero. During the Spencer hearing,[5] the defense presented the following additional documents: bankruptcy records; King’s divorce file; school records; jail records to demonstrate good behavior and King’s unwillingness to take medication; and work records.
On December 4, 2009, the trial judge sentenced King to death for the murder of Denise Amber Lee. In pronouncing King’s sentence, the trial court determined that the State had proven beyond a reasonable doubt the existence of four statutory aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel (HAC), see § 921.141(5)(h), Fla. Stat. (2007) (great weight)[6]; (2) the murder was cold, calculated, and premeditated (CCP), see § 921.141(5)(i), Fla. Stat. (2007) (great weight); (3) the murder was committed for the purpose of avoiding lawful arrest, see § 921.141(5)(e), Fla. Stat. (2007) (great weight); and (4) the murder was committed while King was engaged in the commission of a sexual battery or kidnapping, see § 921.141(5)(d), Fla. Stat. (2007) (moderate weight).
The trial court concluded that King established the existence of two statutory mitigating circumstances: (1) King’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, see § 921.141(6)(f), Fla. Stat. (2008) (moderate weight)[7]; and (2) his age at the time of the offense (thirty-six years old), see § 921.141(6)(g), Fla. Stat. (little weight).[8] The trial court found thirteen nonstatutory mitigating circumstances, which included: (1) a head injury in 1978 (moderate weight); (2) a PET scan with abnormal findings in the frontal lobe demonstrating a brain injury (moderate weight); (3) an IQ in the borderline range between low average and mentally retard *222 ed (moderate weight); (4) repeating grades in school and being placed in special education classes (little weight); (5) being despondent and depressed and attempting to address his bankruptcy, unemployment, a failed marriage, an impending foreclosure on his home, and breaking up with his girlfriend (little weight); (6) a history of nonviolence (moderate weight); (7) being a cooperative inmate (some weight); (8) never abusing drugs or alcohol (some weight); (9) having a thirteen-year-old son whom he helped raise and for whom he cares (little weight); (10) being a good father (little weight); (11) being a devoted boyfriend (little weight); (12) being a good worker (little weight); and (13) having a close relationship with family and friends (little weight).
The trial court concluded that the aggravating circumstances established in this case substantially outweighed the mitigating circumstances and imposed a sentence of death upon Michael King. This direct appeal followed.
ANALYSIS[9]

The Cross-Examination of Robert Salvador

In his first claim, King asserts that the trial court improperly limited the cross-examination of State witness Robert Salvador. We disagree.
The record reflects that during cross-examination, defense counsel confronted Salvador with prior inconsistent statements. For example, when the police first visited Salvador’s residence at 1:30-2:00 a.m. on January 18,[10] Salvador failed to inform the police that he had been with King the day before. Salvador later visited the North Port Police Department and told police that he was with King at the firing range on the 17th. Salvador also initially informed the police that when he arrived home on the 17th, he deleted all phone calls that he received from King that day; however, he later informed the police that there was one call from King that had not been deleted. Toward the end of cross-examination, the following dialogue occurred:
COUNSEL: Mr. Salvador, at the gun range on January 17th, 2008, you arranged to meet Michael King later that day; didn’t you?
SALVADOR: I’m sorry. Can you repeat the question?
COUNSEL: Sure. The question is on January 17th, 2008, at the gun range, before you left, before you parted ways with Michael King,. you arranged to meet him later that day; didn’t you?
SALVADOR: No, sir.
COUNSEL: And didn’t you go over to his home on Sardinia that day, January 17th, 2008?
SALVADOR: No, sir, I did not.
COUNSEL: And wasn’t the purpose of going over there to bring a lawn mower and a gas can?
*223 SALVADOR: Absolutely not.
COUNSEL: To help him cut his grass?
SALVADOR: No, sir.
COUNSEL: And didn’t you meet him out on Plantation Boulevard during the evening hours of January 17th, 2008?
SALVADOR: No, sir.
COUNSEL: And, Mr. Salvador, didn’t you fire the shot that killed and took the life of Denise Lee?
SALVADOR: Absolutely not.
After Salvador was excused as a witness, the prosecutor asked to address a matter outside of the presence of the jury. After the jury left the courtroom, the State argued that defense counsel did not have a good-faith basis for asking the inflammatory questions because of prior inconsistent statements made by King which had been suppressed by the trial court. The State argued the “door was opened” by defense counsel’s cross-examination because the jury would assume that defense counsel had received the factual information in the questions from King himself. The State argued that King’s suppressed statements should now be allowed into evidence because they were inconsistent with the theory that Salvador shot Lee. The trial court ultimately refused to admit King’s prior statements. While the trial court concluded that merely asking Salvador if he shot Lee was not improper, the judge instructed the jury to disregard the three other questions asked by defense counsel, stating that “there is no basis in fact from the evidence for the asking of said questions.” Defense counsel subsequently moved for a mistrial based upon the instruction, which the trial court denied.
Limitations on the cross-examination of a witness are within the sound discretion of the trial court, and a ruling concerning such limitations will only be reversed if the aggrieved party demonstrates an abuse of that discretion. See Kormondy v. State, 845 So.2d 41, 52 (Fla.2003). The United States Supreme Court has held that “the Constitution guarantees criminal defendants ‘a meaningful opportunity to present a complete defense.’” Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). However, the Supreme Court has also explained that this opportunity is not without limitation:
While the Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury....
A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. See, e.g., 41 C.J.S., Homicide § 216, pp. 56-58 (1991) (“Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded”); 40A Am.Jur.2d, Homicide § 286, pp. 136-38 (1999) (“[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged.... [Such evidence] may be excluded where it does *224 not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant’s trial.” (footnotes omitted)).
Holmes v. South Carolina, 547 U.S. 319, 326-27, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).
For a defendant to make statements in questions to introduce a theory of the possibility that someone else committed a crime, there must be sufficient evidence in the record to support that underlying theory. See Cohen v. State, 581 So.2d 926, 927 (Fla. 3d DCA) (holding that where the defendant alleged that the victim met with a drug dealer days before the murder, the theory that “somebody else did it” was properly excluded where “there is insufficient evidence on the record to support its relevancy”), review denied, 592 So.2d 679 (Fla.1991). Other jurisdictions have also concluded that the other evidence introduced in the case must provide a clear link to the crime charged. In Johnson v. United States, 552 A.2d 513 (D.C.1989), the District of Columbia Court of Appeals explained:
“[Bjefore evidence of the guilt of another may be deemed relevant and thereby admissible, the evidence must clearly link that other person to the commission of the crime.... ”
What we mean by “clearly link” ... is proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense.... [S]ee 29 Am.Jur.2d, Evidence § 441 (1967) (defendant should not be able to “indulge in conjectural inferences that some other person might have committed the offense”).
Id. at 516 (quoting Brown v. United States, 409 A.2d 1093, 1097 (D.C.1979)). Similarly, in a case where the defendant contended that the murder of the victim was a revenge killing because the victim’s father was a police informant, the Arkansas Supreme Court held that the trial court did not abuse its discretion in excluding this evidence where it only created an inference or conjecture as to the guilt of the third party, and “there was no direct or circumstantial evidence linking the drug dealers to the actual perpetration of this particular crime.” Shields v. State, 357 Ark. 283, 166 S.W.3d 28, 32 (2004).
Furthermore, questions asked during cross-examination must have a good-faith basis. See Rhodes v. State, 547 So.2d 1201, 1205 (Fla.1989). Recently, in Gosciminski v. State, 994 So.2d 1018 (Fla.2008), this Court ordered that a capital defendant receive a new trial where the State asked a question that lacked a good-faith basis in the evidence. In that case, the deceased victim’s diamond ring was stolen. See id. at 1020. The defendant’s fiancée stated that the defendant had given her an engagement ring that matched the description of the victim’s ring, but the defendant later had the ring returned to him, and it had not been seen again. See id. at 1021. However, witnesses who had seen the ring were asked to select the ring out of a lineup (a replica of the original ring was created by a jeweler for use in the lineup). See id. at 1021 n. 3. Witnesses who picked the ring out of the lineup noted that the ring they actually saw was old, dirty, and covered with a dark substance. See id. at 1024.
The defendant testified during trial and, on cross-examination, the prosecutor asserted in questions that the substance on the ring was the victim’s blood and accused the defendant of not wiping the blood off the ring before showing it to others. See id. at 1023. The trial court overruled the defense objection because *225 there was a considerable amount of blood around the victim’s body and the victim’s hands were in bloody areas. See id. at 1024. It could therefore be inferred that at the time of the murder, the jewelry that was removed from the victim’s hand was covered with blood. See id.
On appeal, this Court concluded that the trial court had abused its discretion when it overruled the objection and allowed the questions. See id. We noted that there was no evidence introduced during trial that demonstrated that the black substance on the ring was blood. See id. Although the trial court viewed photographs that showed a considerable amount of blood around the victim, we held that it could not be inferred that the ring the defendant exhibited to the witnesses actually had blood on it. See id. This Court ultimately concluded that the State had improperly suggested to the jury in the form of a question that the substance on the ring was blood, and the State lacked a good-faith basis for asking this question. See id.
At issue in this case is whether the trial court abused its discretion in instructing the jury to disregard the questions which included statements by defense counsel that (1) Salvador had agreed to meet King later in the day on January 17, 2008; (2) Salvador actually went to King’s house later that day; and (8) Salvador met King at Plantation Boulevard before Lee was shot. Defense counsel presented no tangible evidence to support his contention that any of these events actually occurred. For example, to support these questions, the defense could have presented independent evidence to support the statements in the questions. Instead, defense counsel relied upon Salvador’s inconsistent statements with regard to other facts, contending they evidenced a guilty conscience due to Salvador’s purported involvement in the shooting of Denise Lee. For two reasons, we conclude that the trial court did not abuse its discretion when it instructed the jury to disregard the questions.
First, Salvador’s inconsistent statements and alleged evasiveness with regard to other facts do not provide a clear link to the death of Lee. See Johnson, 552 A.2d at 516. A huge inferential leap would be required to equate these alleged prior inconsistent statements with guilt of murder. In fact, during trial, Salvador provided more logical explanations as to why he provided police different facts and engaged in what could be perceived as suspicious conduct, such as deleting King’s phone calls. Salvador explained that when the police appeared at his house at 1:30-2:00 a.m. on the morning of January 18, they only asked Salvador if he knew who King was — not whether he had seen King that day — and the visit lasted only five minutes. Although Salvador was informed during the visit that King had been apprehended in relation to a kidnapping, Salvador testified that he did not believe the matter was that serious and assumed it was only a domestic disturbance between King and one of his girlfriends.
Furthermore, Salvador admitted that he had lied to his wife about going to the firing range because he was supposed to be working, and he did not want her to think that he was not working to support the household. Salvador also explained that he deleted the phone calls from King before the 1:30-2:00 a.m. visit by police because his wife did not like King and did not want Salvador to spend time with him. Finally, Salvador stated that during his meetings with the police, he felt as though he was being treated as a suspect (which he was until January 20):
I was terrified at the time, of course, the situation of being that close to somebody that could have done something like *226 that. So I’m not going to sit here and say that I wasn’t afraid. I’m not going to sit here and say that I wasn’t tongue tied, and it was very difficult for me to try to remember everything that had gone on.
Thus, the fact that Salvador’s actions and statements concerning other facts can be attributed to fear and also a desire to keep information from his wife demonstrates that there is no clear link between these actions and the murder of Lee.
Second, the facts asserted in the questions asked by defense counsel, and defense counsel’s theory of the murder, were highly implausible. Under that theory, Salvador arranged to meet King near Plantation Boulevard for the sole purpose of shooting someone whom he had never met. Moreover, during trial, Detective Chris Morales testified that Salvador had established he could not have been in the area of the crime at the time it occurred. Given the sheer unlikelihood and improbability of defense counsel’s scenario — unsupported by any evidence whatsoever— plus the elimination of Salvador as a suspect in the murder based on independent facts established by law enforcement, we conclude that the trial court’s decision to strike the three questions for lack of sufficient evidence in the record to support those allegations (or defense counsel’s theory for that matter) was a reasonable and sound use of discretion. See Cohen, 581 So.2d at 927.

Improper Closing Statement

Next, King claims that during guilt-phase closing statements, the prosecution improperly shifted the burden of proof to King to demonstrate that he did not shoot Lee. The record reflects that the State advanced three theories of the crime: (1) King acted alone; (2) Denise Lee consented to go with King, consented to participate in sexual activity with King, and consented to go to Plantation Boulevard, but someone else shot her; and (3) King kidnapped and raped Denise Lee, but did not shoot her. After discounting the second theory, the prosecution then asked the jury to decide which of the remaining two was most logical:
What’s the better inference? That a person that doesn’t tell everything they know right away to police at 2:00 o’clock in the morning would randomly go shoot somebody? Is that a reasonable inference? Or would a reasonable inference be the person that would abduct somebody and rape them and bring them in their car and do the things that Michael King did, that they are the one who would kill the person?
Shortly after this statement, the prosecution asked the jury to “hold [the defense] to the statement that they said to you in opening and ask for the evidence that they said would show that someone other than Michael King committed this offense.”
It is permissible during closing statements for the State to “emphasize uncontradicted evidence for the narrow purpose of rebutting a defense argument since the defense has invited the response.” Caballero v. State, 851 So.2d 655, 660 (Fla.2003). Here, during opening statements, defense counsel specifically told the jury that “[t]he evidence will show that Michael King did not fire the shot that ended Denise Lee’s life.” (Emphasis supplied.) In telling the jury to ask defense counsel for the evidence that demonstrated someone other than King committed the murder, the prosecution was not arguing that King was required to show beyond a reasonable doubt that someone else shot Lee. Instead, the prosecutor only sought to demonstrate that the defense— contrary to its assertion during opening statements — had failed to provide any evidence that someone other than King shot *227 Lee. Accordingly, the trial court did not abuse its discretion in overruling defense counsel’s objection and denying a mistrial based upon this statement by the prosecution.

Admission of Shell Casings from the Firing Range

In his next challenge, King contends that the nine-millimeter shell casings recovered from the firing range should not have been admitted into evidence by the trial court because they were not shown to have been fired by King, nor were they shown to have ever been in the possession of King.
A trial court has broad discretion in determining the relevance of evidence, and such a determination will not be disturbed absent an abuse of discretion. See Heath v. State, 648 So.2d 660, 664 (Fla.1994). This Court has explained that “any fact relevant to prove a fact in issue is admissible into evidence unless its admissibility is precluded by some specific rule of exclusion.” Bryant v. State, 235 So.2d 721, 722 (Fla.1970) (quoting Williams v. State, 110 So.2d 654, 658 (Fla.1959)). Section 90.403, Florida Statutes (2007), provides that “[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” However, it has been observed that “ ‘[m]ost evidence that is admitted will be prejudicial or damaging to the party against whom it is offered.’ The question under the statute is not prejudice but instead, unfair prejudice.” State v. Williams, 992 So.2d 330, 334 (Fla. 3d DCA 2008) (citation omitted) (quoting Charles W. Ehrhardt, Florida Evidence § 403.1 (2007 ed.)).
In United States v. Williford, 764 F.2d 1493 (11th Cir.1985), the Eleventh Circuit Court of Appeals explained:
Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.
Id. at 1499. This Court has also allowed admission of evidence similar to that used in a homicide where the evidence “was relevant and admissible to explain the entirety of the criminal episode.” Cole v. State, 701 So.2d 845, 855 (Fla.1997). In Cole, one victim died as a result of a slit throat and three blows to the head. See id. at 849. The surviving victim testified that when the defendants first approached the campsite, one of them was carrying a walking stick. See id. at 848. Over objection, an oak walking stick that was found in the vicinity of the body was admitted during trial. See id. at 855. The victim testified that the stick matched the characteristics of the one that the codefendant had been carrying. See id. Although there was no hair or blood on the stick, this Court held that the trial court did not abuse its discretion in admitting the walking stick. See id. In doing so, this Court agreed with the trial court that the lack of blood or hair on the stick “related to its weight rather than its admissibility.” Id.
The record demonstrates that immediately before the kidnapping of Denise Lee, King fired a nine-millimeter handgun at the gun range that he had retrieved from under the passenger seat of his Cá-maro. After shooting at the range, Salvador returned King’s gun to that same location. Denise Lee died from a gunshot *228 wound, and the medical examiner testified that the entrance wound was one centimeter wide and, therefore, the bullet could not have been larger than one centimeter (or ten millimeters). A nine-millimeter shell casing was found in the vicinity of Lee’s gravesite, and Lee’s hair and blood were found on and in King’s Camaro. The forty-seven nine-millimeter shell casings from the range, where King was known to have shot his personal weapon on the day that Denise Lee died from a gunshot wound, were properly admitted because they were inextricably intertwined in the flow of events and “linked in time and circumstances with the charged crime,” Williford, 764 F.2d at 1499, and also “relevant ... to explain the entirety of the criminal episode,” Cole, 701 So.2d at 855.
Although King contends that some other person could have fired the gun that produced the shell casings, this fact does not render the evidence inadmissible. Rather, the possibility that someone other than King fired the weapon that produced the shell casings only relates to the weight of the evidence. See id. Accordingly, we hold that the trial court did not abuse its discretion when the forty-seven shell casings from the range were placed into evidence along with the other evidence to which they related.

Frye Hearing on Tool-Mark Identification

King next asserts that the trial court erred in declining to conduct a Frye[11] hearing on the admissibility of tool-mark identification of fired shell casings where the weapon that fired the casings is not available.[12]
This Court has explained with regard to the need for Frye hearings:
We review Frye issues de novo, with general acceptance considered as of the time of the appeal. Id. [Castillo v. E.I. Du Pont De Nemours & Co., Inc., 854 So.2d 1264 (Fla.2008) ] “By definition, the Frye standard only applies when an expert attempts to render an opinion that is based upon new or novel scientific techniques.” U.S. Sugar Corp. v. Henson, 823 So.2d 104, 109 (Fla.2002) (emphasis added). Therefore, we have recognized that Frye is inapplicable in the “vast majority” of cases. Id.
Marsh v. Valyou, 977 So.2d 543, 547 (Fla.2007). We have reviewed the history of tool-mark comparison, and we conclude that the trial court did not err when it declined to conduct a Frye hearing. Deci-sional law demonstrates that tool-mark identification in the context of ballistics has been used in the criminal context since at least 1929, and in Florida since at least 1937. See, e.g., State v. Boccadoro, 105 N.J.L. 352, 144 A. 612, 613 (Err. & App. 1929) (bullet removed from body and bullet previously fired into the ground were fired from the same weapon); Riner v. State, 128 Fla. 848, 176 So. 38, 39-40 (1937) (holding that firearms expert properly testified that the bullet found in the victim’s body was fired from the pistol introduced into evidence and noting that “[t]he weight *229 and credibility of his evidence was a matter for the jury to determine.”).
Although King contends that tool-mark identification in the absence of a known weapon should be subject to a Frye inquiry, research reveals that both Florida courts and other state and federal courts have admitted this evidence since at least 1969. See State v. Williams, 992 So.2d 330, 332 (Fla. 3d DCA 2008) (“Based on an examination of the casings, a firearms expert determined that the bullet casings recovered from all three robberies were fired from the same weapon.”); Dornau v. State, 306 So.2d 167, 171 (Fla. 2d DCA 1974) (shell casings found in the open space behind defendant’s business and shell casing found at the murder scene were fired from the same gun, even though the gun was never produced), cert. denied, 422 U.S. 1011, 95 S.Ct. 2636, 45 L.Ed.2d 675 (1975); People v. Williams, 15 Mich.App. 683, 167 N.W.2d 358, 360 (1969) (“The shell casings found at the scene of the second robbery were of the same caliber and fired by the same gun which fired the shell casing found at the scene of the first robbery .... ”); see also United States v. Foster, 300 F.Supp.2d 375, 376 (D.Md.2004) (finding that “the general reliability of the science of ballistics, including comparisons of spent shell cartridge casings even where there is no ‘known’ weapon recovered ” had been established (emphasis supplied)).
In light of this well-documented history of tool-mark identification over the last century, we conclude that this procedure is not new or novel and, therefore, the trial court properly declined to conduct a Frye hearing.

Peremptory Strike of Minority Juror

In his next claim, King asserts that the trial court erroneously accepted the State’s explanation for exercising a peremptory strike to remove a minority juror. We conclude that no such error has been demonstrated.
A trial court’s decision to allow a peremptory strike of a juror is based primarily on an assessment of credibility and, therefore, that decision will be affirmed unless it is clearly erroneous. See Melbourne v. State, 679 So.2d 759, 764 (Fla.1996). Further, peremptory challenges are presumed to be exercised in a nondiscriminatory manner. See id. However, where a party alleges that a peremptory strike is racially based, a three-part procedure applies to resolve the allegation:
A party objecting to the other side’s use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3).
Murray v. State, 3 So.3d 1108, 1119 (Fla.2009) (quoting Melbourne, 679 So.2d at 764). We have explained that in step 3, the focus of the court is on the genuineness, not the reasonableness, of the explanation. See Rodriguez v. State, 753 So.2d 29, 40 (Fla.2000).
Here, when asked why the prosecution chose to exercise a peremptory *230 strike of juror 111,[13] the following response was given:
On Juror Number 111, she’s an 18-year-old female. She came across as meek, young and inexperienced. She’s the youngest on the panel we have existing so far.
Her statement during the original death qualification was that living life in prison is more awful than a death sentence. Her brother has a pending felony drug charge. She watches the television show CSI. Commonly, a concern of ours is that they would hold us to a TV standard as opposed to a regular standard.
Soon thereafter, the following dialogue occurred:
PROSECUTOR: As a single thing, a genuine — my race neutral reason, this is not a challenge for cause, she indicated that living a life in prison is more awful than a death sentence.
COURT: Other jurors have said it. Other jurors have said the same thing.
PROSECUTOR: And I will strike what other jurors are remaining on the panel that said that. I’m consistently getting rid of any—
COURT: Here’s what I’m going to find. The fact that — was it her brother who has a pending—
PROSECUTOR: Yes. According to her questionnaire, her brother has a pending drug charge.
COURT: Pending criminal charge? All right. I’m going to find based upon that that is a genuine race neutral reason and I’ll grant the challenge, peremptorily-
On appeal, King asserts that, according to juror Ill’s questionnaire, her brother did not have a pending drug charge, but was only facing the possibility of a disorderly conduct charge. However, during voir dire, defense counsel did not correct the trial court or the prosecutor with regard to any misunderstanding of the facts in juror Ill’s questionnaire. Had defense counsel done so, the trial court could have inquired of the prosecutor further with regard to the basis for the strike of this juror. Accordingly, King’s challenge to the striking of juror 111 based upon the erroneous reading of her questionnaire has been waived. See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) (“Except in cases of fundamental error, an appellate court will not consider an issue unless it was presented to the lower court.”); see also Rimmer v. State, 825 So.2d 304, 321 (Fla.2002) (“The trial court in this instance cannot be faulted for accepting the facial reason offered by the State, especially where the State’s factual assertion went unchallenged by the defense.”).
Further, this Court has previously upheld peremptory strikes where the basis for the strike was the same as that relied upon by the trial court in this case. See, e.g., Fotopoulos v. State, 608 So.2d 784, 788 (Fla.1992) (“The fact that a juror has a relative who has been charged with a crime is a race-neutral reason for excusing that juror.”); Bowden v. State, 588 So.2d 225, 229 (Fla.1991). Although King now contends that there were other jurors on the panel who had family members with criminal charges, defense counsel did not raise that challenge before the trial court. Accordingly, that challenge has also been waived. See Davis v. State, 691 So.2d 1180, 1181 (Fla. 3d DCA 1997).
*231 Moreover, King has failed to identify the race of the similarly situated jurors who were seated on King’s jury. Since the race of the seated jurors is unclear, King cannot show that the strike of juror 111 was racially motivated. See Alonzo v. State, 46 So.3d 1081, 1084 n. 2 (Fla. 3d DCA 2010) (“If the record fails to identify the respective race of the challenged and unchallenged jurors, the appellate court cannot determine if pretext exists.”), review denied, 70 So.3d 586 (Fla.2011); Davis, 691 So.2d at 1182 (where record failed to reflect the race of allegedly similarly situated jurors, it was impossible for the Court to determine the issue of pretext).
In light of the foregoing, King has failed to demonstrate that the trial court’s decision to allow the peremptory strike of juror 111 was clearly erroneous. See Melbourne, 679 So.2d at 764. Therefore, we deny relief on this claim.

Proportionality

In reviewing for proportionality, the totality of the circumstances should be considered and the matter should be compared with other capital cases. See Nelson v. State, 748 So.2d 237, 246 (Fla.1999). This comparison, however, is not between the number of aggravating and mitigating circumstances. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Additionally, the death penalty is reserved only for the most aggravated and least mitigated murders. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
In the instant matter, the jury recommended the death penalty for the murder by a vote of twelve to zero. The trial court found this recommendation appropriate after weighing the statutory aggravating circumstances against the statutory and nonstatutory mitigating circumstances. In imposing the death penalty, the trial court found four statutory aggravators to be established beyond a reasonable doubt: (1) HAC (great weight); (2) CCP (great weight); (3) the murder was committed for the purpose of avoiding lawful arrest (great weight); and (4) the murder was committed while King was engaged in the commission of a sexual battery or kidnapping (moderate weight). The trial court found two statutory mitigating circumstances, but only granted one “moderate” weight and the other “little” weight. While the trial court found thirteen nonstatutory mitigating circumstances, four received “moderate” weight — the lowest weight given to any of the statutory aggravating circumstances — and the remainder received only “some” or “little” weight.
After reviewing both the totality of the circumstances and prior precedent, we hold that the death sentence is proportionate. In Johnston v. State, 863 So.2d 271, 274 (Fla.2003), this Court upheld a death sentence where the defendant strangled a woman in her home. In that case, no evidence of sexual battery was introduced during trial. See id. at 275. The trial court in Johnston found only two aggravators, HAC and prior violent felony, one statutory mitigating circumstance— that the defendant’s capacity to conform his conduct to the requirements of law was substantially impaired — and twenty-six nonstatutory mitigating circumstances. See id. at 278 n. 5-7. Here, in addition to murdering the victim, King also kidnapped Lee from her home and raped her. Further, the trial court in this case found two additional significant aggravators not found in Johnston to be applicable. See also Brant v. State, 21 So.3d 1276 (Fla.2009) (death penalty upheld where defendant raped and strangled a woman in her home; trial court found two aggravators, HAC and murder committed during a sexual battery; three statutory mitigating cir *232 cumstances, lack of significant criminal history, age (thirty-nine years old), and substantially impaired capacity to conform conduct to the requirements of law; and ten nonstatutory mitigating circumstances); Douglas v. State, 878 So.2d 1246 (Fla.2004) (death penalty upheld where defendant raped and fatally beat a woman; trial court found two aggravators, HAC and murder committed during a sexual battery; one statutory mitigating circumstance, lack of significant criminal history; and sixteen nonstatutory mitigating circumstances). Moreover, CCP and HAC are two of the weightiest aggravating factors in Florida’s capital sentencing scheme, see Abdool v. State, 53 So.3d 208, 224 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011), and the trial court found both to apply to the murder of Lee.
King abducted a young mother from her home, leaving her two children — an infant and a toddler — unattended. He transported her to his house where she was bound with duct tape, raped, and sodomized. He then acquired a shovel, drove her to an abandoned construction sight, and shot her in the head. Given the angle of the entrance wound, and the fact that a substance appearing to be ocular fluid was found on the car, it is logical to conclude that Lee was not blindfolded at the time of her shooting, and she saw the gun as it was placed against her head. Furthermore, because Lee was abducted from her home between 1 and 2 p.m. on the 17th, and her 911 call was made at 6:14 p.m., it can be deduced that Lee was held captive by King for over four hours. As noted in the sentencing order, rarely is a court able to experience first-hand what a deceased victim encountered. In this case, anyone who listens to the 911 call placed by Denise Lee will hear the abject terror she was experiencing plus her panicked, frantic pleas to the 911 dispatcher (for help) and King (to be returned home). This murder was unquestionably cold and cruel.
We are in complete agreement with the trial court that the death sentence is proportionate in this case.
CONCLUSION
Based upon the foregoing analyses and considerations, we affirm King’s convictions and sentences.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. While the jurors were provided with a written transcript of the 911 call, only one page of the five-page transcript was included in the record on appeal. The parties should have ensured that the full transcript was included and were remiss in failing to do so. Due to the absence of the transcript, the text of the call is derived from the transcription of the court reporter and an audio recording of the 911 call that was included as part of the record on appeal. Brackets indicate words that the Court could hear but were not fully understood or transcribed by the court reporter.

. Harold Muxlow testified that King was wearing a white shirt with a design when he arrived to borrow the shovel, gas can, and flashlight. Accordingly, King changed his shirt sometime between the time he left Mux-low's residence and when the police detained him on 1-75.

. However, at the same time, this witness testified that she spoke with King on the morning of January 17th, and between the hours of 4 and 6 p.m. that day (i.e., after he abducted Denise Lee), and he sounded completely normal.

. Of the three reasons for a score that indicates lack of full effort' — a deliberate attempt to perform poorly; a lack of motivation to perform well; or simple distraction — Ga-mache suspected that King’s scores were a result of the second or third possibility. However, Gamache also believed that a couple of responses indicated a deliberate attempt to perform poorly.

. See Spencer v. State, 615 So.2d 688 (Fla.1993).

. With regard to this aggravator, the trial court stated:
It is most extraordinary and extremely rare that one can actually hear [the] emotions in the voice of an innocent victim, who is doomed to be murdered.... [T]he 911 recording of the victim[] tragically reveals her fear, mental state, her terror and her emotional strain. One need only listen to portions of this call to comprehend her mental state.
The trial court also expressed in a footnote, "The court acknowledges that although it quotes from the 911 call, it cannot, by any means, convey the fear and terror clearly heard in Denise Lee’s voice in that recording.”

. The trial court stated that only moderate weight was accorded to this mitigating circumstance due to the conflicting opinions of the experts.

. It is both unclear and questionable why the trial court found age to be a mitigating factor.

. As a preliminary matter, even if a defendant has not presented a sufficiency challenge, as here, this Court has an independent obligation to review the record to determine whether sufficient evidence exists to support each conviction. See Overton v. State, 801 So.2d 877, 905 (Fla.2001); Fla. R.App. P. 9.142(a)(6). We conclude that the record clearly supports the convictions for the kidnapping, sexual battery, and first-degree murder of Lee.

. The record does not indicate how the police obtained Salvador’s name or why they visited his house at 1:30-2:00 a.m. However, Detective Chris Morales testified that, although Salvador was eventually exonerated, from January 18th through the 20th he was considered a suspect in the disappearance of Lee.

. See Frye v. United States, 293 F. 1013 (D.C.Cir.1923).

. ICing also challenges the manner in which the firearms examiner was allowed to testily with regard to how certain he was of a "match” between the three fired shell casings from the range and the shell casing located near the burial site. We have reviewed the testimony of the examiner and conclude that the trial court did not abuse its discretion in allowing this testimony. See generally Finney v. State, 660 So.2d 674, 682 (Fla.1995) ("A trial court has broad discretion in determining the range of subjects on which an expert witness can testify, and, absent a clear showing of error, the court’s ruling on such matters will be upheld.”).

. Because of the high-profile nature of this case, the jurors were referenced by number throughout the trial.